IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In Re:  PrimeCare Medical of West Virginia, Inc.,         Case No:  6:24-bk-60001

**Debtor.**

                                                                                                           Chapter:  7
                                                                                                           Judge B. McKay Mignault

**CREDITOR WANDA PERDUE'S
<u>MOTION TO DISMISS UNDER 11 U.S.C. § 707(a)</u>**

Creditor Wanda Perdue[1] respectfully moves to dismiss the instant Chapter 7 bankruptcy case of PrimeCare Medical of West Virginia, Inc. ("Debtor" or "PrimeCare WV") pursuant to 11 U.S.C. § 707(a).  Section 707(a) provides: "The court may dismiss a case under this chapter only after notice and only for cause[.]"  "Cause" in the context of section 707(a) explicitly includes "unreasonable delay by the debtor that is prejudicial to creditors," § 707(a)(1), and courts have interpreted it to include petitions that "serve no legitimate bankruptcy purpose."  *See In re Krueger*, 812 F.3d 365, 370–71 (5th Cir. 2016) (citing *Kelley ex rel. Petters Co., Inc. v. Cypress Fin. Trading Co., L.P.*, 620 Fed. Appx. 287, 289 (5th Cir. 2015) (per curiam)); *Liebmann v. Goden*, 629 F. Supp.

---

[1]  Ms. Perdue is the administrator of the estate of Charles Perry.  Counsel for Ms. Perdue also represents *at least* 10 other creditors, including the following individuals identified in "Part 2" of Debtor's Schedule E/F to its Chapter 7 Petition as "Creditors with NONPRIORITY Unsecured Claims" (identified by name and box number from Debtor's Part 2): 3.1, Andy Lee Griffin; 3.4, Charles Watts; 3.5, Douglas M. Bircher; 3.8, Gregory Pyles; 3.10, Joyce Lynn Horner; 3.12, Kayla Thomas; 3.15, Matthew Goss; 3.16, Maynard Meadows; 3.21, Sherrie Bell; and 3.23, Tyler Franklin.  Ms. Perdue's position as a creditor is somewhat different, however, because she and Debtor agreed to settlement of her claim before Debtor filed its Petition, and thus has a liquidated, non-contingent contract claim, rather than a non-liquidated, contingent claim. In order to minimize our clients' involvement with this patently improper proceeding and the associated time and expense, none of these other creditors have appeared. The instant Motion to Dismiss is filed on behalf of Wanda Perdue, but obviously these other "creditors" would not oppose it.

3d 314, 322 (D. Md. 2022) ("Petitions that 'serve no legitimate bankruptcy purpose,' for example, may be dismissed for cause.") (citing *Krueger,* 812 F.3d at 370–71, and *Cypress Fin.*, 620 Fed. Appx. at 289).

It is axiomatic that a *Chapter 7* bankruptcy petition filed by a *corporation* with *no assets* serves no legitimate bankruptcy purpose, because the corporation is not eligible for a discharge injunction and there are no assets to liquidate or distribute to creditors. *See* 11 U.S.C. § 727(a)(1) (prohibiting the granting of a "discharge" to a corporation under Chapter 7). As one court explained, "A corporate Chapter 7 bankruptcy has one purpose: to allow an entity breathing space to marshal assets for orderly distribution to creditors. When . . . the debtor has no assets, no viable claims or causes of action, and no other money-making prospects, Chapter 7 bankruptcy cannot serve even this limited function." *Cypress Fin.*, 620 Fed. Appx. at 287–88 (internal citation omitted).

## I. STATEMENT OF FACTS

### A. Debtor Is a Corporation

It is beyond dispute that Debtor is a corporation and "not an individual" for purposes of obtaining a discharge under 11 U.S.C. § 727(a)(1). According to the testimony of the Debtor's CEO, Thomas Weber, at the Meeting of Creditors on February 15, 2024, the Debtor is registered as a corporation under "subchapter S."[2]

### B. Debtor Has No Assets, No Claims, and No Intent to Operate Again

---

[2] *See* Transcript, Meeting of Creditors (February 15, 2024) (attached as "Exhibit A") (hereafter "Ex. A, 2/15/2024 Transcr." or "Ex. A") at 6.

2

Debtor denied having any assets in its Petition.[3] Mr. Weber flatly testified that Debtor has "no assets" at the meeting of creditors.[4] He then answered "no" when asked by the Trustee whether Debtor has "any claims against anyone that it could collect on."[5] Mr. Weber also said that the corporation has no intent to resume operations or earn income, describing Debtor as a corporation with "no operations, no employees, and no intent to ever regain operations."[6]

### C. Debtor's Stated Purpose and Motive in Filing the Petition Is to "Get Satisfaction of Outside Claims" to Enable Debtor's Dissolution

At the meeting of creditors, Wanda Perdue's counsel asked the Debtor's CEO what "purpose" Debtor "hope[d] to achieve in filing 14 the Chapter 7 petition," given that Debtor "claims to have no assets."[7] Mr. Weber responded that he wanted to "get satisfaction of outside claims," because, he said, he does not believe he can dissolve the corporation until that happens.[8]

### II. ARGUMENT

Section 707(a) of the bankruptcy code provides that the court "may dismiss a case under [Chapter 7] only after notice and a hearing and only for cause." 11 U.S.C. § 707(a). Section 707(a) gives three examples of "cause" for dismissal, one of which—"unreasonable delay by the debtor

---

[3] *See* Petition of PrimeCare Medical of West Virginia, Inc. (January 17, 2024) (hereafter "Petition") at Form 206Sum (listing "$0.00" for "Total of all property" in "Part 1" of Form 206Sum); *id.* at Form 206A/B, pp. 1–3 (answering "No" to all questions about existence of assets, including answers of "No" to questions about both "office" "equipment" and "machinery" "equipment" and answering "$0.00" to line 92 for "Total of all property on Schedule A/B").
[4] *See* Ex. A, 2/15/2024 Transcr. at 19 (answering Trustee's question as to whether anything has been done to protect assets by saying, "[T]here are no assets."); *id.* at 26–27 (testifying that medical equipment such as "blood pressure cuffs" and "EKGs" "remained pursuant to contract with the [W. Va. Division of Corrections] and . . . reverted to property of the State" or were "just scrapped as obsolete").
[5] *Id.* at 18.
[6] *Id.* at 21.
[7] *Id.*
[8] *Id.* Creditor Wanda Perdue's purpose in this Statement of Facts section is simply to set forth the relevant undisputed facts. However, Creditor notes that Mr. Weber is grossly misinformed about the relevant bankruptcy and dissolution issues. *See* Argument Part II.B, *infra*.

3

that is prejudicial to creditors"—is sufficient to support dismissal of the instant case. *Id.*, § 707(a)(1). However, the three examples are only meant to be "illustrative, not exhaustive." *Liebmann v. Goden*, 629 F. Supp. 3d 314, 322 (D. Md. 2022).

A finding of "bad faith" is *not* required to find "cause" for dismissal under Section 707(a). "If a petition is an '[i]nappropriate use of the Bankruptcy Code,' then a court need not find 'bad faith' present to dismiss a petition for cause." *Id.* at 322 (quoting *In re Murray*, 900 F.3d 53, 60 (2d Cir. 2018)). The absence of a legitimate bankruptcy purpose is, by itself, sufficient basis for dismissal. *See Associacion de Titulares de Condominio Castillo*, 581 B.R. 346, 357–58 (1st Cir. B.A.P. 2018); *In re Asset Resolution Corp.*, 552 B.R. 856, 863 (Bankr. D. Kan. 2016) (holding that creditors are not prejudiced by dismissal and dismissal is appropriate where "Debtor is not pursuing a fundamental Chapter 7 bankruptcy purpose—liquidating assets for the benefit of creditors.").

The debtor's stated motive is also relevant. As one court explained the process of ruling on a motion to dismiss:

> The ultimate question [is] whether the petition was filed with the *intent and desire to obtain the relief that is available under a particular chapter* of the Bankruptcy Code, through the means that Congress has specified, or whether the debtor is pursuing *some other goal*. In making this determination, courts look at the totality of the circumstances leading up to the filing of the case including *the debtor's motive* in filing, the purposes which will be achieved in the case, and *whether the debtor's motive and purposes are consistent with the purpose of Chapter 7*.

*Associacion*, 581 B.R. at 362 (internal quotation marks and citations omitted) (emphasis added).

Putting this together, there are three relevant questions or factors to consider in a case such as this, each of which can form a sufficient and independent basis for dismissal: First, is it even *possible* for the instant bankruptcy petition to serve a legitimate purpose given the status of the debtor (as corporation rather than an individual) and the state of its finances—i.e., does it have at

4

least *some* assets for the Trustee to liquidate and distribute? Second, assuming there is at least a possible legitimate purpose—which is not true in PrimeCare WV's case—courts then look at the debtor's *actual* motives and ask whether the debtor's motives and purposes align with the hypothetically legitimate bankruptcy purpose identified in answer to the first question. Third, courts should consider whether the bankruptcy case will cause "unreasonable delay by the debtor that is prejudicial to creditors." 11 U.S.C. § 707(a); *see also Cypress Fin.*, 620 Fed. Appx. at 289 (holding that a bankruptcy case that "only delays litigation already pending against the debtor" should be dismissed). Each of these three factors will be discussed in turn, below.

### A. A "No Asset" Chapter 7 Petition Filed by a Corporation Serves No Legitimate Bankruptcy Purpose and Should Be Dismissed

The first question is whether the instant Petition serves or *could possibly serve* a legitimate bankruptcy purpose given the status of Debtor as a corporation and the fact that it has no assets whatsoever. *See Liebmann v. Goden*, 629 F. Supp. 3d 314, 322 (D. Md. 2022) ("Petitions that 'serve no legitimate bankruptcy purpose,' for example, may be dismissed for cause.") (citing *Krueger*, 812 F.3d at 370–71, and *Cypress Fin.*, 620 Fed. Appx. at 289). If it does not or cannot serve a legitimate purpose, the court's analysis should end there. The answer in the instant case is no.

A Chapter 7 bankruptcy petition filed by a corporation with no assets simply cannot serve a legitimate purpose. The two purposes of bankruptcy—what courts sometimes refer to as the "twin pillars"—are the discharge of the debtor (in order to obtain a "fresh start") and the satisfaction of valid claims against the estate through the liquidation of assets (when assets are available). *See In re Van Gompel*, 632 B.R. 730, 735 (Bankr. D.S.C. 2021) (quoting *In re Zimmer*, 623 B.R. 151, 162 (Bankr. W.D. Pa. 2020) ("[D]ismissal of the bankruptcy case is the appropriate remedy when neither of the 'twin pillars' of bankruptcy are present . . . (1) a discharge for the

5

honest but unfortunate debtor, and (2) when assets are available for the satisfaction of valid claims against the estate."); *In re Blackmon*, 628 B.R. 804, 810 (Bankr. D.S.C. 2021) (same); *In re Lots by Murphy, Inc.*, 430 B.R. 431, 436 (Bankr. S.D. Tex. 2010).

The first pillar, a discharge, is *never* available to a corporation in a Chapter 7 case. *See* 11 U.S.C. § 727(a)(1) (prohibiting the granting of a "discharge" to a corporation under Chapter 7); *Lots by Murphy*, 430 B.R. at 436 ("[T]he Debtor, because it is a corporation, may not obtain discharge from a Chapter 7 filing [and] [t]herefore, the first pillar of the bankruptcy system would not be achieved by keeping this case on the docket.") (internal citation omitted). This is by congressional design, not by accident, and *not* because Chapter 7 proceedings effect a corporate dissolution—they do not. *See NLRB v. Better Bldg. Supply Corp.*, 837 F.2d 377, 379 (9th Cir. 1988) ("Chapter 7 proceedings cannot dissolve a corporation. If the [debtors] sought to dissolve their corporations, they should have used state procedures."). Rather, Congress adopted Section 727(a)(1) to "avoid trafficking in corporate shells." *Id*. (internal quotation marks and citation omitted). As one court explained, Congress wanted "to prevent businesses from evading liability by liquidating debtor corporations and resuming business free of debt." *Id*.

Because the first pillar, a discharge, is *never* available to a corporation in a Chapter 7 case, the only possible legitimate purpose in such cases is the second pillar, what courts sometimes refer to as "the satisfaction of valid claims against the estate." *Lots by Murphy,* 430 B.R. at 436; *Van Gompel*, 632 B.R. at 735; *Zimmer*, 623 B.R. at 162; *Blackmon*, 628 B.R. at 810. As the Fifth Circuit explained clearly and succinctly in a *per curiam* opinion: "A corporate Chapter 7 bankruptcy has one purpose: to allow an entity breathing space to marshal assets for orderly distribution to creditors." *Kelley ex rel. Petters Co., Inc. v. Cypress Fin. Trading Co., L.P.*, 620 Fed. Appx. 287, 287 (5th Cir. 2015) (per curiam).

6

Whether courts refer to the second pillar as "breathing space to marshal assets for orderly distribution to creditors," *Cypress Fin.*, 620 Fed. Appx. at 287, or as "the satisfaction of valid claims against the estate,"[9] all courts agree that a corporation must at least have *some* assets for a bankruptcy case to serve this purpose. Where, as in the instant case, a corporate "debtor has no assets, no viable claims or causes of action, and no other money-making prospects, Chapter 7 bankruptcy cannot serve even this limited function," and dismissal is appropriate. *Cypress Fin.*, 620 Fed. Appx. at 287–88. "[T]he second pillar [is present] even if [the debtor's] assets are such that claims can only be paid a very small percentage on the dollar. The key is that *at least some portion* of claims, however small, *be paid through liquidation of assets*." *Blackmon*, 628 B.R. at 810 (quoting *Zimmer*, 623 B.R. at 162, and *Lots by Murphy,* 430 B.R. at 436) (emphasis added); *see also Lots by Murphy,* 430 B.R. at 436 ("[B]ecause the Debtor has *no assets whatsoever* for the Trustee to liquidate to pay claims, the second pillar is likewise unachieveable.") (emphasis added).

The analysis by the bankruptcy court in the District of Kansas in dismissing a no-asset, corporate Chapter 7 bankruptcy case is particularly instructive for the instant case:

> [T]here is no reason for [the debtor] to remain in Chapter 7. This is not a Chapter 7 case filed to maximize value for creditors, corporations do not receive a discharge, the Debtor has no business to reorganize, and there are no assets for the Trustee to liquidate. The circumstances of this case suggest [the debtor] is employing the instant bankruptcy case as a litigation tactic to delay adjudication of the District Court Action, for the benefit of not only the [d]ebtor, but also the Combat Parties. Debtor is not pursuing a fundamental Chapter 7 bankruptcy purpose—liquidating assets for the benefit of creditors. Thus, dismissing the instant case does not prejudice estate creditors.

*In re Asset Resolution Corp.*, 552 B.R. 856, 863 (Bankr. D. Kan. 2016).

---

[9] *Lots by Murphy,* 430 B.R. at 436; *Van Gompel*, 632 B.R. at 735; *Zimmer*, 623 B.R. at 162; *Blackmon*, 628 B.R. at 810.

The instant case must be dismissed for this reason alone. Debtor is a corporation and has repeatedly affirmed and sworn that it has no assets of any kind, no claims against anyone else, no business operations to reorganize, and no prospect or intention of ever resuming gainful operations. *See* Facts, Part I, *supra*. There is no legitimate bankruptcy purpose to be served by the instant Chapter 7 case.

**B. Debtor's Stated Motive for Filing the Case Is Improper and Unachievable**

Assuming *arguendo* that the instant Chapter 7 petition could serve a legitimate purpose—as explained in the previous section, Argument, Part II.A, *supra*, it cannot—the next question would be whether Debtor's motives and purposes actually line up with that hypothetical legitimate purpose. Specifically, courts consider "the debtor's motive in filing, the purposes which will be achieved in the case, and whether the debtor's motive and purposes are consistent with the purpose of Chapter 7." *See Associacion de Titulares de Condominio Castillo*, 581 B.R. 346, 362 (1st Cir. B.A.P. 2018) (internal quotation marks and citation omitted).

We know that the "the debtor's motive and purposes are [not] consistent with the purpose of Chapter 7" in the instant case, because Debtor's CEO was asked his motive at the meeting of creditors and gave at least a partially truthful—albeit grossly misinformed—answer. Asked what "purpose" Debtor "hope[d] to achieve in filing 14 the Chapter 7 petition" (given that Debtor "claims to have no assets"), Debtor's CEO, Tom Weber, answered: "To be in a position, since it has no operations, no employees, and no intent to ever regain operations, to be in a position to dissolve the corporation, which cannot be done until outside—we get satisfaction of outside claims." *See* Ex. A, 2/15/2024 Transcr. at p. 21, lines 11–18. Mr. Weber's stated motive is patently improper for two separate reasons.

   1. **A corporation cannot "get" satisfaction in Chapter 7 and a corporation with no assets cannot *give* satisfaction to its creditors**

8

Given that Mr. Weber affirmed Debtor's statements in its Petition that it has *no* assets whatsoever, *see* Facts Part I.B., *supra*, Mr. Weber could not possibly have meant that Debtor wants to satisfy or give any amount of "satisfaction" to valid claims against the estate when he said he hopes "we [Debtor] get satisfaction of outside claims." Ex. A, 2/15/2024 Transcr. at 21. A debtor can only give "satisfaction" to creditors when the debtor has at least *some* assets available. *See In re Van Gompel*, 632 B.R. 730, 735 (Bankr. D.S.C. 2021) (quoting *In re Zimmer*, 623 B.R. 151, 162 (Bankr. W.D. Pa. 2020) (describing the second pillar or the two legitimate purposes of bankruptcy as applying only "*when assets are available* for the satisfaction of valid claims against the estate") (emphasis added).

Mr. Weber has also inverted the getting and giving relationship between debtors and creditors with his peculiar use of the word "satisfaction." Mr. Weber wants to "get" satisfaction rather than *give* satisfaction, but that is not how bankruptcy cases work. Bankruptcy cases allow *debtors* to *provide* (at least some measure of) "satisfaction" *to creditors* who hold valid claims against the estate, not for debtors to "*get* satisfaction" or *obtain* satisfaction from creditors, as Mr. Weber said he wants for Debtor. It appears, therefore, that what Mr. Weber was trying to say is that he wants to "get" *relief from* "outside claims," to *take* something (such as a discharge or release) rather than to give anything (such as partial satisfaction of valid claims). The first pillar of bankruptcy does provide relief to *individuals* in Chapter 7 (and possibly even to corporations in Chapter 11) from valid claims in the form of a permanent discharge of those claims—once the estate's assets, if any, have been liquidated and the valid claims against the debtor have been "satisfied" to the extent that the orderly distribution of those liquidated assets allows. However, that relief is not available to corporations in Chapter 7. Thus, Debtor's "motive and purposes" in wanting to "get satisfaction" are *not* consistent with the purpose of a corporate Chapter 7 case.

9

### 2. "Satisfaction" of claims is neither a prerequisite to, nor an effect of, corporate dissolution

Mr. Weber's stated purpose of using the instant Chapter 7 case "to be in a position to dissolve the corporation," also reveals a patently improper motive. Mr. Weber's claim that dissolution of a corporation such as Debtor's "cannot be done until . . . we get satisfaction of outside claims," 2/15/2024 Transcr. at 21, shows that Mr. Weber either does not know what corporate dissolution involves and what its effect is, or that he hopes the lawyers representing Debtor's many creditors—mostly personal injury and specifically medical malpractice plaintiffs in pending litigation against Debtor—will not know. A simple misunderstanding of the law might be unsurprising from a layperson, but it cannot be assumed, and would reflect *very* poorly on a corporate CEO with counsel making or defending hugely significant decisions in the life of a corporation—here, decisions to file for bankruptcy and to seek to dissolve the corporation he heads. Whether Mr. Weber is laboring under a misunderstanding or trying to deceive Debtor's creditors, the salient point is that he is wrong about the law and his stated motive of using Chapter 7 to facilitate dissolution is not consistent with Chapter 7's legitimate purposes.

As noted already in Argument Part II.A, *supra*, a Chapter 7 bankruptcy does *not* dissolve a corporation. *See NLRB v. Better Bldg. Supply Corp.*, 837 F.2d 377, 379 (9th Cir. 1988) ("Chapter 7 proceedings cannot dissolve a corporation."). Rather, the same body of state law that creates corporations and governs them during their operations also dissolves them and governs the effect of dissolution. "If the [debtors] sought to dissolve their corporations, they should have used state procedures." *Id*.

The "satisfaction of outside claims" is neither required for, nor an effect of, the dissolution of a corporation under the West Virginia Code. This is true even in the extremely unlikely event that Mr. Weber meant to say that Debtor wants to "*give*," rather than "get," "satisfaction of outside

claims," through the liquidation and payment or partial payment of those claims—which would be a legitimate bankruptcy purpose but one that requires a debtor to have at least *some* assets.[10] A corporate board and the corporation's shareholders can easily dissolve a West Virginia corporation after it has commenced doing business, notwithstanding the existence of *unsatisfied and still pending* "outside claims" against it—so long as the corporation has a board of directors and shareholders to generate and vote on a dissolution proposal. *See* W. Va. Code § 31D-14-1402. A corporation may thereafter *dissolve* at any time simply by delivering the approved articles of dissolution to the Secretary of State. *See* W. Va. Code § 31D-14-1403.

Outside claims against a corporation are not "satisfied" (in Mr. Weber's words), barred, dismissed, discharged, released, or "abated" or "suspended" (the words of the West Virginia Legislature) by dissolution. *See* W. Va. Code § 31D-14-1405(b)(6). Those claims remain pending against even a fully dissolved corporation. *Id.* A dissolved corporation can even be sued in a proceeding commenced *after* its formal dissolution. *See* W. Va. Code § 31D-14-1405(b)(5).[11] Dissolution and the "satisfaction" or discharge of outside claims legally have nothing to do with one another.

---

[10] What he actually said—that Debtor wants to "get satisfaction of outside claims"—implies that he wants to get some form of (unavailable) *relief* from those claims through discharge, mandatory release, abatement, suspension, or dismissal of the claims. Ex. A. at 21.

[11] The W. Va. Code does provide a written notice procedure for a dissolved corporation to use at any time *after* the effective date of its dissolution to set a deadline (no less than 120 days from notice) for the filing of *known* claims against it, and *known* claims filed after that deadline are barred if the claimant received the written notice. W. Va. Code § 31D-14-1406. However, that is only a deadline for bringing the claim, and does not extinguish claims brought within that time, even though the corporation is, per a requirement in the provision, already dissolved. *Id*. The Code also provides a publication notice procedure for a dissolved corporation to use at any time *after* dissolution to set a deadline of five years for the filing of *unknown* claims against it, and *unknown* claims filed more than five years after the publication notice are barred. W. Va. Code § 31D-14-1407. These provisions do not, however, prevent or cut off the prosecution of timely-made claims.

11

3. **Debtor wants to wipe the slate clean to shield *other* entities such as its insurers, parent corporation, and the State of West Virginia, from the potential effects of adverse *findings* as to Debtor's liability in its many "outside claims"**

It is therefore clear that Debtor's motive is improper even if there were some legitimate purpose that could theoretically be served by this case, like the discovery, notwithstanding Mr. Weber's assurances, of trivial assets to liquidate and distribute in a "pennies on the dollar" scenario. Mr. Weber says he wants to "get satisfaction" of outside claims to facilitate or effect Debtor's dissolution. Ex. A at 21. Apart from the bankruptcy issues preventing the *getting* or *giving* of satisfaction—corporations are not eligible for discharge, and at least *some* assets are needed to give satisfaction—neither the getting nor the giving of satisfaction of outside claims is a prerequisite to, or an effect of, corporate dissolution.

In other words, *nothing* is currently stopping Debtor from dissolving itself as a corporation. *See* W. Va. Code § 31D-14-1402; *id.* § 31D-14-1403. Also, the dissolution itself, like the instant bankruptcy case, would achieve nothing in the way of "satisfaction" for Debtor—other than orderly record-keeping at the Secretary of State's office—for two reasons. First, a proper corporation with no assets is already judgment-proof and has no reason to be concerned about lawsuits or even to answer them, much less to defend them.

Second—and much more importantly from the perspective of Debtor's *creditors*, whose pending cases are being unreasonably delayed by Debtor's filing of the instant Chapter 7 case—dissolved corporations can still sue and be sued in their name for purposes (at least) of adjudicating and establishing the corporation's liability *in order to collect against other entities* who have derivative liability or derivative obligations. There are at least three such groups or categories of entities who have or arguably have derivative liability under the facts of all or at least most of the pending medical malpractice claims against Debtor—once Debtor's liability becomes *established*

12

by a jury verdict in a court of law. In order of obviousness of the potential for derivative liability, those three categories of other entities with potential derivative liability are: (1) Debtor's insurer or insurers; (2) Debtor's potential alter-egos, primarily the parent corporation, PrimeCare Medical, Inc., where it can be shown that the corporation was engaged in or part of a shell game to evade liability for debts and misdeeds[12]; and (3) entities whose traditional, common-law vicarious liability for the medical negligence of Debtor's employees would be cut off by statute *if but only if* Debtor properly maintained one million dollars in insurance coverage for acts of medical negligence by its employees and complied with the self-funding provisions of the statute for any self-insured portions of that coverage. This latter category of entities with vicarious liability for the acts of Debtor's employees under the traditional common-law rule *definitely* includes the State of West Virginia, who owned and operated the facilities and infirmaries where the acts of medical negligence occurred, and it *almost certainly* includes Debtor's parent as well.[13]

---

[12] Potential alter-ego liability against a shareholder (such as a parent corporation) derived from "piercing the corporate veil" or similar proof following an adjudication of the underlying corporation's liability needs to be distinguished from the claw-back provision of the West Virginia Code that allows unknown claimants who bring claims against a dissolved corporation within five years of the dissolution to "enforce" a judgment (i.e., "collect" a judgment)—*automatically and by right, despite the observance of all corporate formalities*—against "a shareholder of the dissolved corporation to the extent of his or her pro rata share of the claim or the corporate assets distributed to him or her in liquidation, whichever is less." W. Va. Code § 31D-14-1407(d). The latter claim is limited to the share of assets distributed during dissolution and requires no proof of abuse of the corporate form, while the former (veil-piercing) is not limited but requires proof of abuse of the corporate form.

[13] Under the traditional, common-law rule, facilities (such as hospitals) and anyone else that the public would ordinarily and reasonably associate with the provision of the medical care at issue were liable for the negligent acts of independent contractors and other non-employees just as if the individual providers were their actual employees. The enactment of W. Va. Code § 55-7B-1, et seq., ended that practice, but only so long as the healthcare providers (or their direct employers) maintained at least $1,000,000 in insurance and complied with the requirements for a qualified self-funding insurance program for any self-insured portion. *See, e.g.*, W. Va. Code § 55-7B-9(g) (requiring a healthcare provider to maintain at least $1,000,000 in insurance in order to cut off the traditional "vicarious" liability of non-employers of the negligent provider); W. Va.

13

Categories (1) and (3) of entities with derivative liability are *alternatives* to one another. If one of those two categories has derivative liability, then the other does not—but at least one of those two *must* have derivative liability. That is, *either* Debtor's insurers have an obligation to injured third parties to pay the very first dollar of any verdict against Debtor, notwithstanding the terms of the policy "deductible," *or* the "deductible" provision is actually a "self-insured retention"—a self-funding insurance program under which Debtor holds the primary policy up to the "deductible" amount and the "insurer" acts as an excess insurer above that amount.[14] Debtor admitted at the meeting of creditors that it did not comply with the statutory requirements for self-funding insurance programs. *See* Ex. A, 2/15/2024 Transcr., at 37–38; W. Va. Code § 55-7B-12 (setting trust and administration requirements for self-funding programs to qualify as meeting a healthcare provider's insurance requirements). Therefore, if Debtor's insurer's "deductible" is interpreted as a true deductible, Debtor's insurer is liable. If it is interpreted as a self-insured retention, then Debtor failed to comply with Section 55-7B-9(g), which provides in relevant part: "A health care provider may not be held vicariously liable for the acts of a nonemployee pursuant to a theory of ostensible agency *unless the alleged agent does not maintain professional liability insurance covering the medical injury which is the subject of the action in the aggregate amount of at least $1 million for each occurrence*." W. Va. Code § 55-7B-9(g) (emphasis added).

---

Code § 55-7B-12 (setting trust and administration requirements for self-funding programs to qualify as meeting insurance requirements).

[14] Under an ordinary "deductible," the insurer is obliged to pay the first dollar to a third party, but then retains the right to pursue reimbursement from the insured (here, Debtor), for any amounts paid up to the amount of the "deductible." When an insurer is not obliged to pay anything to a third party unless and until the insured makes payments to those third parties up to or exceeding a certain amount, that amount is ordinarily referred to as a "self-insured retention," and the insurer is essentially in the position of having sold an excess policy, over and above the primary policy, which in such cases is the self-insured retention.

Thus, when Mr. Weber says he thinks he needs to "get satisfaction of outside claims" in order to dissolve Debtor, he is not only technically and legally wrong from the perspective of the Debtor itself under the West Virginia Code, see Argument, Part II.B.2, *supra*, but also he is almost certainly not thinking about or concerned about *Debtor's* needs or finances. If Debtor and Mr. Weber are telling the truth and Debtor truly has no assets—and we have no reason to dispute that technical point—then Debtor itself is already 100% judgment-proof. Simple logic tells us that when Mr. Weber says he wants to "get satisfaction of outside claims," Ex. A at 21, Mr. Weber *must be* thinking about Debtor's only shareholder, parent corporation PrimeCare Medical, Inc. ("Parent"), plus maybe Debtor's and Parent's mutual insurer (which will undoubtedly raise the Parent's premiums on annual renewals in response to any payouts for claims against Debtor). Mr. Weber may also be thinking about the Parent's reputation and its ability to enter into future contracts with other states or even with West Virginia, because the failure to have secured the contractually required insurance under its contracts with the State—and its failure to protect the State from lawsuits under traditional vicarious liability theories by securing qualifying insurance—will have a devastating effect on the Parent's reputation. What Mr. Weber is not thinking about—what he cannot be thinking about if he truly believes his claim that Debtor has no assets and no desire to resume operations—is Debtor itself, because Debtor is 100% judgment-proof.

In fact, since Debtor stopped operating in July 2022, and since Debtor last received a payment for business operations in October 2022, Debtor's Parent, PrimeCare Medical, Inc., has been paying—under the guise of making "capital infusions" to Debtor—Debtor's costs of defense and any settlements in cases filed against Debtor for medical malpractice, with those so-called "capital infusions" passing directly through Debtor's bank account to the law firm or settling

15

claimants being paid. *See* Ex. A, 2/15/2024 Transcr. at 14–15; *id.* at 24; *id.* at 40–44.[15] Indeed, Debtor entered into a settlement agreement with Creditor Wanda Perdue herself in November 2023, well after Debtor stopped doing business or receiving money from business operations. *Id.* at 41. Debtor entered into that settlement with the "expectation that it would receive a capital infusion from the parent" that would enable Debtor to pay it. *Id.* at 43. However, Debtor's Parent refused to make that so-called "capital infusion" because, according to Mr. Weber, by that time Debtor had a fully formed plan to file this Chapter 7 bankruptcy case and was "concerned about the potential for the appearance of a preferential payment." *Id.*

Thus, the circumstances of the instant case indicate that what Tom Weber, who is both Debtor's and Debtor's Parent's CEO, hopes to achieve from the instant Chapter 7 bankruptcy is some kind of shield against, or at least a delay of, litigation and claims against Debtor for the benefit of Debtor's *Parent*, not Debtor. That Debtor's *Parent* continued making payments for Debtor's settlements and to the law firm working on Debtor's behalf for more than a year after Debtor ceased operating or receiving income from operations shows clearly that Debtor's Parent *knows* it is otherwise obligated to pay those debts on Debtor's behalf for one reason or another.[16] *See In re Asset Resolution Corp.*, 552 B.R. 856, 863 (Bankr. D. Kan. 2016) (finding that "[t]he circumstances of this case suggest [the debtor] is employing the instant bankruptcy case as a

---

[15] Debtor's business was providing medical services to incarcerated individuals under a contract or contracts with the State of West Virginia, and ended when Debtor lost the contract.

[16] See preceding discussion in the instant Argument Part, *supra*. Ms. Perdue is not asking for this Court to weigh in on or decide these complex issues of insurance contract interpretation and West Virginia's medical malpractice law—just the opposite. These are issues that *must* be decided by West Virginia's courts, and the instant bankruptcy essentially amounts to creative forum-shopping in an effort to delay or even to deprive West Virginia's courts of the ability to resolve important policy issues that directly impact the State and the citizens of this State.

litigation tactic to delay adjudication of [litigation] for the benefit of not only the [d]ebtor, but also [affiliated entities]" and therefore finding that dismissal for cause is warranted).

Given that Debtor cannot get a discharge injunction from a Chapter 7 case, *see* Argument Part II.A, supra, it is difficult to know what Debtor's Parent expects to accomplish by putting Debtor into bankruptcy. A delay of pending litigation is of course guaranteed, and no doubt welcome, but Debtor could be hoping for more. Fortunately, however, this Court does not have to know everything or exactly what Debtor's Parent hopes to achieve from the instant bankruptcy, because the stack of wholly sufficient, independent causes for dismissal is already high and still growing. The simple lack of any legitimate bankruptcy purpose to be served by the filing of a Chapter 7 Petition by a corporation with no assets is sufficient for dismissal. *See* Argument Part II.A, *supra*. Moreover, we *know* that there is no rational motive for a 100% judgment-proof business to file for bankruptcy protection for itself. Such a corporation can simply ignore any claim pending against it and any summons it receives, and doing so is no more immoral or harmful to its valid creditors than filing for bankruptcy and *literally disclosing $0.00 in total assets*, so its motive is at the very least highly suspect. On top of that, the motive that Debtor advanced in sworn testimony at the meeting of creditors—to "get satisfaction of outside claims" in order to dissolve the corporation—is, for all the reasons stated in the instant section, *supra,* not attainable and nonsensical. Corporate debtors cannot "get satisfaction" from Chapter 7 in the form of relief from pending claims because they are not eligible for a discharge; debtors with no assets cannot give satisfaction to valid creditors because doing so requires assets to distribute, even in a pennies-on-the-dollar situation; and neither giving nor getting satisfaction is a prerequisite to, or an effect of, a corporate dissolution.

The lack of a legitimate bankruptcy purpose is one sufficient basis for dismissal, and Mr. Weber's statement of an improper and unattainable purpose is a second sufficient basis for dismissal. There is one more, which is that the only actual and possible effect of the instant bankruptcy case is to unreasonably delay pending litigation against Debtor to the prejudice of Debtor's (and Debtor's Parent's and Debtor's insurer's) valid creditors.

### C. Debtor's Case Is Causing an Unreasonable and Prejudicial Delay in Litigation Pending Against It

Without knowing exactly what, or everything that, Debtor actually hoped to achieve from the instant bankruptcy case, we do still know, at the very least, that Debtor received an automatic stay merely from filing its Petition, which resulted in an unwelcome delay (from the perspective of creditors) in all of the many civil cases pending against Debtor. That delay in litigation is ongoing and is clearly prejudicial to Debtor's legitimate creditors, the plaintiffs in those civil cases. Given that neither Debtor nor the creditors—because Debtor has no assets to liquidate and distribute to them—can possibly receive any benefit from this case, any such delay is clearly unreasonable and prejudicial to creditors and therefore a sufficient cause for dismissal. *See* 11 U.S.C. § 707(a)(1) (listing "unreasonable delay by the debtor that is prejudicial to creditors" as one of three specifically enumerated "causes" sufficient for dismissal); *In re Asset Resolution Corp.*, 552 B.R. at 863 (Bankr. D. Kan. 2016) (holding that "employing the instant bankruptcy case as a litigation tactic to delay adjudication" of a pending civil action is cause for dismissal); *Cypress Fin.*, 620 Fed. Appx. at 289 ("When a bankruptcy serves no purpose, results in no benefit for its creditors or the debtor, and only delays litigation already pending against the debtor, there is 'cause' to dismiss the case.").

To summarize all of the above, Debtor's valid personal-injury creditors have never expected Debtor itself to pay actual settlements or jury verdicts, and there is no possibility, and

18

never was any possibility, of that happening.  However, Debtor's valid personal injury creditors do expect that, upon a successful adjudication of Debtor's liability, one or more other entities that have derivative liability (whether contractual or vicarious) will pay or will be required to pay—either under Debtor's insurance contracts, or, if not, then because Debtor failed to meet the insurance requirements that would have cut off the vicarious liability of the State of West Virginia and Debtor's Parent.  *See* W. Va. Code § 55-7B-9(g).  The only practical and possible effect of Debtor's Chapter 7 case is to delay pending litigation, under which Debtor's many creditor/plaintiffs seek to adjudicate Debtor's liability *for the purpose of collecting against one or more of those other entities*.  Accordingly, for this reason and for all of the reasons set forth above, Debtor's bankruptcy case should be dismissed, for cause.

## CONCLUSION

Debtor's bankruptcy case should be dismissed, for cause.

                    Wanda Perdue, as Administratrix of the Estate of
                    Charles Perry, Creditor,
                    By Counsel:

/s/ Amanda J. Davis (WVSB #9375)
Charles F. Bellomy (WVSB #9117)
**CALWELL LUCE DITRAPANO PLLC**
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
(304) 343-4323 telephone
(304) 344-3684 facsimile
adavis@cldlaw.com
cbellomy@cldlaw.com

19

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**In Re:**

| | |
|---|---|
| **PrimeCare Medical of West Virginia, LLC** | Case No.: 6:24-bk-60001 |
| **Debtor.** | Chapter 7 |
| | **Judge B. McKay Mignault** |

## CERTIFICATE OF SERVICE

The undersigned, Amanda J. Davis, counsel for Wanda Perdue, as Administratrix of the Estate of Charles Perry, Creditor, hereby certifies that the attached *Creditor Wanda Perdue's Motion to Dismiss Under 11 U.S.C. § 707(a),* has on the 8th day of April, 2024, been electronically filed using the Court's E-Filing system, which will send notification of such filing to all parties of record, including:

| | |
|---|---|
| Thomas Fluharty<br>*Bankruptcy Trustee* | By ECF |
| Joe M. Supple<br>Counsel for Debor | By ECF |

/s/ Amanda J. Davis (WVSB #9375)
Charles F. Bellomy, Esquire (WVSB #9117)
**CALWELL LUCE DITRAPANO PLLC**
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
(304) 343-4323 telephone
(304) 344-3684 facsimile
adavis@cldlaw.com
cbellomy@cldlaw.com