Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 1 of 70

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

IN RE:

    PrimeCare Medical of West Virginia, Inc.

    Debtor.

                    Case Number: 6:24-bk-60001

                    Chapter 7
                    Judge B. McKay Mignault

---

## MEETING OF CREDITORS

---

### FEBRUARY 15, 2024
### 9:30 A.M.

---

### ZOOM VIDEO MEETING

---

# Wendy M. Thomas
# Certified Court Reporter

399 Blue Lick Road
Winfield, WV 25213
304-541-0636
wvnoah@yahoo.com

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 2 of 70

2

**A P P E A R A N C E S**

Debtor's Attorney:

Joe M. Supple
801 Viand Street
Point Pleasant, WV  25550


Bankruptcy Trustee:

Thomas H. Fluharty
408 Lee Avenue
Clarksburg, WV  26301


Attending Creditors:

Beth Kavitz
U.S. Trustee's Office


Amanda Davis
Calwell Luce diTrapano, PLLC
*Representing ~ Wanda Perdue, the Estate of Charles Perry*


Stephen New
Stephen New & Associates
*Representing ~ The putative class in the Rose matter as well
as Rebecca Chapman in a stand-alone case and a number of
other individuals*

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 3 of 70

3

# **T A B L E   O F   C O N T E N T S**

WITNESS                              EXAMINATION

Thomas John Weber                    Mr. Fluharty    Pg 5

                                     Ms. Davis       Pg 21

                                     Mr. New         Pg 51


## **EXHIBITS MARKED FOR IDENTIFICATION**

EXHIBIT                                              MARKED

 (None offered.)



REPORTER'S CERTIFICATE                               Pg 69-70

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 4 of 70

4

1              **P R O C E E D I N G S**

2              MR. FLUHARTY:  All right.  We are going --

3              FEMALE VOICE:  To Joe.

4              MR. FLUHARTY:  -- back to Joe Supple.  All right.

5    Can you hear me, Joe?

6              MR. SUPPLE:  Yes.  Can you hear me?

7              MR. FLUHARTY:  I can very well.  Thank you.  And

8    the next case on today's docket is PrimeCare Medical of West

9    Virginia, Incorporated.  Case Number 24-60001.  Do you have

10   the representative of PrimeCare in your office, or is that

11   Mr. Weber?

12             MR. SUPPLE:  Mr. Weber.  He's remote, so he's

13   calling from his office.

14             MR. FLUHARTY:  Very well.  I'm going to --

15             FEMALE VOICE:  What is his name?

16             MR. FLUHARTY:  Tom Weber.

17             FEMALE VOICE:  Tom Weber?

18             MR. FLUHARTY:  Uh-huh.

19             FEMALE VOICE:  W-E-B-E-R?

20             MR. FLUHARTY:  Uh-huh.  All right.

21             FEMALE VOICE:  And his title?

22             MR. FLUHARTY:  What's his title of the corporation?

23   President?

24             MR. SUPPLE:  CEO.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 5 of 70

5

1          MR. FLUHARTY:  CEO.  Okay.  All right.  The next

2    case on today's docket is PrimeCare Medical of West Virginia,

3    Incorporated.  Case Number 24-60001.  Mr. Weber, Thomas

4    Weber, is the representative of PrimeCare testifying today.

5    Mr. Weber, would you please raise your right hand.

6                         (Witness sworn.)

7        (WHEREUPON,

8                    **THOMAS JOHN WEBER**

9        WAS CALLED AS A WITNESS, DULY SWORN, AND

10       TESTIFIED AS FOLLOWS:)

11                       **EXAMINATION**

12       BY MR. FLUHARTY:

13       Q.   Would you please state your full name and address

14   for the record?

15       A.   Thomas John Weber.  3940 Locust Lane, Harrisburg,

16   Pennsylvania 17109.

17          FEMALE VOICE:  Do you want the address of the

18   business?

19       BY MR. FLUHARTY:

20       Q.   And can you give me the address of PrimeCare

21   Medical of West Virginia?  The last operating address.

22       A.   It would have been the same.

23       Q.   Can you identify for me the owners, officers of

24   PrimeCare Medical?

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 6 of 70

6

1      A.    PrimeCare Medical of West Virginia, Inc. is a

2  wholly owned subsidiary of PrimeCare Medical, Inc.  Its

3  officers include myself --

4      Q.    You're the president?

5          FEMALE VOICE:  CEO.

6          THE WITNESS:  I'm the CEO.

7  BY MR. FLUHARTY:

8      Q.    CEO of?

9      A.    And secretary.

10     Q.    You're the CEO and secretary of PrimeCare?

11     A.    Medical of West Virginia, Inc.

12     Q.    And are there any other officers?

13     A.    Yes.

14     Q.    Who else?

15     A.    Brent Badington, B-A-D-I-N-G-T-O-N, is the

16  president.

17     Q.    All right.

18     A.    And Todd Haskins, H-A-S-K-I-N-S, is the chief

19  operating officer.

20     Q.    All right.  What kind of a corporation is PrimeCare

21  Medical of West Virginia?

22     A.    It is a subchapter S.

23     Q.    When was it incorporated?

24     A.    I'm sorry, did you say when?

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 7 of 70

7

1     Q.    Yes.

2     A.    1998.

3     Q.    Can you tell me a little bit about what it does, or

4 did?

5     A.    What it did, it was a correctional health care

6 company providing full service health care to incarcerated

7 individuals in the State of West Virginia that were detained

8 either in the Division of Juvenile Services or the Regional

9 Jail Authority system.

10     Q.    When did it last operate?

11     A.    June 25th of 19, or excuse me, of 2022.

12     Q.    Why did it -- Why did it -- What happened to it?

13 Why did it cease to operate?

14     A.    When Governor Justice took office, one of his

15 initiatives throughout the state was to consolidate a lot of

16 agencies in an effort to conserve resources, financial

17 resources.  So there was a movement afoot from approximately

18 2018 all the way to 2022 to consolidate the health care

19 services for the juvenile detention centers, the Regional

20 Jails, as well as the Department of Corrections.  And that

21 effort on the State's part resulted in an entity by the name

22 of Wexford Healthcare being awarded the contract to provide

23 the services previously being provided by PrimeCare Medical

24 of West Virginia.  Wexford had been the provider in the

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 8 of 70

8

1   Department of Corrections and, as I said, we had been the

2   provider in the other two layers.  Through a bidding process,

3   Wexford was determined to become the provider in all three

4   lawyers.

5       Q.   Okay.  So you ran out of work?

6       A.   Yes.

7       Q.   Did you subcontract physicians and nurses to

8   provide those services, or were they employees of PrimeCare?

9       A.   Primarily employees.  There would be some

10  contractors, excuse me, some subcontractors as well.

11      Q.   All right.  The records of the corporation, maybe

12  the best question to ask is, how did you maintain your

13  financial records?  What kind of system did you have?

14      A.   Do you mean the computer system that was being

15  utilized, or --

16      Q.   Yeah, that's a good question.

17      A.   I'm not the -- we do have a CFO of the parent

18  company that oversaw, but we had a computer system

19  processing, it's been electronic for as long as I can recall.

20  Back in 2022, I believe we were still on QuickBooks.

21      Q.   When you closed, you were on QuickBooks?

22      A.   Excuse me?

23      Q.   When you closed, you were still using QuickBooks?

24      A.   Yes.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 9 of 70

9

1    Q.    All right.  Who is the CFO of the parent company?

2    A.    Matthew Angelo, A-N-G-E-L-O.

3    Q.    Where is he located?

4    A.    In Harrisburg.

5    Q.    I assume that the parent company has subsidiaries

6    in a number of states.  Do you know what states they're

7    operating in?

8    A.    The parent company has a subsidiary in the State of

9    New York, where in conjunction with professional corporations

10   it provides similar care to county facilities in the State of

11   New York.  The parent company also operates facilities absent

12   a subsidiary in New Hampshire, Maryland and Florida.

13   Q.    So it's operating those four states right now?

14   A.    Correct.

15   Q.    New York, New Hampshire, Maryland and Florida.

16   A.    And Pennsylvania.  I'm sorry.

17   Q.    And Pennsylvania.  Because that's where you are?

18   A.    Yes.

19   Q.    Okay.  So five states.  Did it ever maintain paper

20   records of any kind?

21   A.    I mean, all of our medical records were electronic.

22   I mean, there are -- there are paper copies, there is nothing

23   that would not be backed up electronically that I can think

24   of.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 10 of 70

10

1    Q.   Where are the electronic records maintained?

2    A.   We contract with a data farm somewhere in Virginia,

3  I believe, that ultimately has storage responsibility for us.

4  We're making a conversion to cloud base currently.

5    Q.   Is it like an online archive company of some type?

6    A.   Yeah.

7    Q.   Yeah.

8    A.   Yes, someone who could afford all the --

9    Q.   I understand, yeah.  Joe and I are familiar with

10  that.  It's involved in another case that we're dealing in,

11  so I understand that.  What was the last year, I mean, how do

12  you file tax returns?  Did PrimeCare of West Virginia file an

13  individual corporate income tax return each year?

14    A.   It's consolidated with the parent.

15    Q.   Consolidated, okay, they do a -- All right.

16          MR. SUPPLE:  Hey, Tom?

17          MR. FLUHARTY:  Yeah.

18          MR. SUPPLE:  We could not upload the consolidated

19  return to DocLink, so I asked my staff to email that to

20  Betty.  And they did that today.  Just, it's too big.  It's

21  too big.

22          MR. FLUHARTY:  Yeah, Betty called in sick this

23  morning, so I'm here.

24          MR. SUPPLE:  It's about 500 pages.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 11 of 70

11

1          MR. FLUHARTY:  Oh, okay.  I probably won't print it

2    off.  I'll probably just take a look at it.  And I'm probably

3    going to, just in case I have questions about that, I did not

4    have a chance to print that off this morning to take a look

5    at.  I'll probably end up continuing this until --

6          FEMALE VOICE:  3/7.

7          MR. FLUHARTY:  March 7th at 9 o'clock.  Just in

8    case I have any other questions.  It may be on March 7th at 9

9    o'clock, we'll come on for me just to say, "I don't have any

10   questions," but there might be questions and, if there are,

11   there are.

12         BY MR. FLUHARTY:

13         Q.   Where did PrimeCare maintain bank records?  I

14   noticed on an exhibit that there were a lot of payments made

15   up until Joe was paid.  Did you maintain your own separate

16   bank account, I assume you did, just for the West Virginia

17   subsidiary?

18         A.   Yes, we do.

19         Q.   And where did you maintain that?

20         A.   With PNC.

21         Q.   And was there a particular branch you dealt with

22   normally?

23         A.   There's a, yes, there's a central Pennsylvania

24   office that we primarily deal with.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 12 of 70

12

1    Q.   Do you know where at?

2    A.   But it's done electronically now through

3    Harrisburg.

4    Q.   You do all your deposits and everything

5    electronically?

6    A.   Yeah.  Yes.

7    Q.   And did you have bank accounts anywhere other than

8    PNC?  Let's say --

9    A.   There would have been a bank account at Centric

10   Bank, also in Harrisburg, that was recently bought out by an

11   entity by the name of First Commonwealth Bank.

12   Q.   Are there any balances in any of those accounts?

13   A.   No.

14   Q.   Besides PNC and Centric Bank, which is now First

15   Commonwealth Bank, did the corporation use any other banking

16   facility in the last six years?

17   A.   No.

18   Q.   And has it filed all of its corporate income tax

19   returns?

20   A.   Yes, all that are due.

21   Q.   And did it file any and all 940, 941 state

22   withholding tax reports that should have been filed?

23   A.   Yes.

24   Q.   And I didn't know whether you had any W-2s or 1099s

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15    2024    Page 13 of 70

13

1  or 1098s that you needed to send, but has everything in that

2  nature been filed with the IRS?

3      A.   Yes, that would have been completed as of the

4  beginning of 2023.

5      Q.   Does the corporation own anything right now?

6      A.   No.

7      Q.   Anything real or personal?

8      A.   No.

9      Q.   Has it owned or had interest in any kind of real

10  estate in the last five years?

11      A.   No.

12      Q.   If the State of West Virginia had not assigned the

13  bid or the contract to Wexford, is there anything else that

14  would have driven PrimeCare out of business?

15      A.   It had been losing money operationally leading up

16  to the consolidation, however, had the consolidation occurred

17  in our favor, it would have been at a price that we would

18  have been able to maintain and continue business.  If the

19  consolidation had not taken place, it had failed one previous

20  effort, and if the State changed its mind and wanted to

21  remain having separate providers, it would have required a

22  renegotiation of our expired contract in order for us to have

23  been in a position to continue operations in West Virginia.

24      Q.   Okay.  I notice what appears to be several, maybe

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024    Page 14 of 70

14

1    not several, but a number of lawsuits that PrimeCare was

2    involved in, and actually a lot of payments being made.  Were

3    all of the lawsuits in the nature of malpractice cases?

4        A.    Yes.  Some of them would also assert a civil rights

5    component to them, but they would -- other than I believe we

6    have one employment matter listed, all the others would have

7    been related to our role in providing health care to the

8    incarcerated individuals.

9        Q.    What was the nature of the employment lawsuit?

10        A.    After we left the state, an entity that was

11    pursuing Wexford on a failure to pay for missed lunches claim

12    filed a punitive class action against PrimeCare asserting

13    similar allegations.

14        Q.    And what's the status of that case?

15        A.    It's still pending.

16        Q.    Still pending?

17        A.    Well --

18        Q.    Right, stayed, but yeah.

19        A.    Yeah.

20        Q.    And then everything else was in the nature of a

21    class action -- in the nature of medical malpractice?

22        A.    Yes.

23        Q.    Your attorney listed a variety of disbursements.  I

24    think he went back -- I think he went back 90 days or close

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 15 of 70

15

1    to it, at least, ending with the payment to him.  And you

2    indicated that you ceased operating, doing business, in 2022,

3    but you kept issuing disbursements.  Where did -- If you

4    weren't operating, where did that funding come from?

5        A.   Those were capital infusions from the parent

6    company.

7        Q.   Were all of your -- were all of your creditors

8    getting paid something on a monthly basis, or were these

9    creditors paid because you had some kind of settlement

10   agreement with them and you're just paying out based on a

11   settlement?

12       A.   Other than the payments that would have been made

13   on a regular basis to the law firm defending our interests

14   down there, all the other payments would have been as the

15   resolution of claims.

16       Q.   Okay.  Offutt Simmons Simonton, that was your

17   attorney?

18       A.   Correct.

19       Q.   And were you paying them on a current basis?  As

20   they billed you monthly, you paid them?

21       A.   Yes.

22       Q.   How about Buchanan Ingersoll and Rooney?

23       A.   It is -- they are doing the employment matter.

24       Q.   So they're your counsel, also?

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 16 of 70

16

1       A.   Yes.

2       Q.   Sherry Bell?

3       A.   That would have been a claim.

4       Q.   So that was a creditor.  I don't see -- How about

5  Bill Stroebel, of Stroebel and Stroebel?

6       A.   He was also representing a former patient.

7       Q.   So that was a settlement to a plaintiff --

8       A.   Yes.

9       Q.   -- or a claimant?

10      A.   Yes.

11      Q.   Okay.  So in the 90 days prior to filing

12  bankruptcy, you only paid out to two individuals, Sherry Bell

13  and Stroebel and Stroebel, whoever they represented.  As far

14  as creditors are concerned, everyone else -- all other

15  disbursements were to your counsel for ongoing legal

16  services?

17      A.   Yes.

18      Q.   Okay.  The $125,000 that you paid to Sherry Bell,

19  was that in satisfaction of a claim in total?

20      A.   Yes.

21      Q.   And was that a malpractice claim?

22      A.   Yes.

23      Q.   Were you like a self-insurer then?  I mean, you

24  don't have other -- you don't have a malpractice carrier that

Case 6:24-bk-60001  Doc 31-1  Filed 04/08/24  Entered 04/08/24 13:48:03  Desc
Exhibit Transcript of Meeting of Creditors of February 15  2024  Page 17 of 70

17

1    you turn those over to?  You defend your own claims?

2        A.    We have an insurance company, but the structure of

3    it is that -- essentially, given the high deductible level,

4    we were essentially self-insured.

5        Q.    Okay.  And maybe I either wasn't listening close

6    enough.  The $125,000, was that a complete settlement for

7    satisfaction of that claim?

8        A.    Yes.

9        Q.    Okay.  And was the $15,000 to Stroebel and Stroebel

10   a total satisfaction of that claim?

11       A.    Yes.

12       Q.    Okay.  And besides these two -- and these were both

13   in the nature of malpractice?

14       A.    Yes.

15       Q.    So those two individuals perhaps received payment

16   preferentially in regards -- as compared to other creditors

17   in this case?

18       A.    Potentially, yes.

19       Q.    Okay.  Are you aware of any other -- I mean,

20   everything else seems to be your counsel of record.  Are you

21   aware of any other payment made in the 90 days preceding

22   filing of the bankruptcy that was in the nature of -- that I

23   would view -- maybe your attorneys discussed this with you

24   already, that we might view as being in preference to other

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 18 of 70

18

1    creditors?

2         A.   Not that I'm aware of.

3         Q.   Okay.

4         MR. SUPPLE:  Tom, I wonder if it is a preference as

5    the funds really came from the parent company.  It wasn't the

6    debtor's assets that was --

7         MR. FLUHARTY:  Well, that's a good question.  I'm

8    not really certain.  It might be direct or indirect.  We'll

9    just have to take a look at it.

10        MR. SUPPLE:  Right.

11        MR. FLUHARTY:  It might not be -- it might not be

12   something that you can get back in any event.  I just don't

13   know.  Maybe you and I will discuss that a little bit more,

14   maybe get a little more detail.  I mean, spent money is hard

15   to recover, you know.  It went out 60, 90 days ago.  Yeah,

16   all right.

17        BY MR. FLUHARTY:

18        Q.   Does PrimeCare have any claims against anyone that

19   it could collect on?

20        A.   Not that we're aware of, no.

21        Q.   This is probably not a real relevant question, but

22   with corporations I always ask my "ice cream melting"

23   question.  I was appointed trustee on a case one time that

24   was a fast food store.  I was over in Martinsburg, and the

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 19 of 70

19

1   judge appointed me to a fast food restaurant or store,

2   convenience store, that also had a hotel component.  And I

3   showed up and there were guests checking out of the hotel on

4   their own.  All the staff just left.  And apparently someone

5   had been in the convenience store dishing out ice cream

6   cones, and they just left the ice cream out.  It was melting

7   onto the floor.  And there are probably more, you know,

8   insignificant circumstances that arise, but are you aware of

9   anything that has to be done for the corporation immediately

10  to protect assets?

11       A.   No, there are no assets.

12       Q.   Yeah, that's what I thought.

13       A.   Yeah, I mean, our operate -- I mean, we only -- by

14  the time West Virginia consolidated the juvenile and the

15  Regional Jail Authority into the Department of Corrections

16  and Rehabilitation, we only had one customer in West

17  Virginia, so all our payments came from one individual, so

18  there wasn't a lot of loose ends to tie up.

19       Q.   I understand.  Is PrimeCare a -- is it on a fiscal

20  year basis or is it a calendar year?  I couldn't answer that

21  question in a bankruptcy case the other day, so the IRS

22  wouldn't respond to something that I wanted.  So are you

23  January to December or are you July to June, or what are --

24  what is your --

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 20 of 70

20

1    A.   (Inaudible.)

2    Q.   What's that?

3    Q.   We're calendar.

4    Q.   Calendar year?

5    A.   I'm sorry.  We're calendar year.

6    Q.   Good.  And you are current on all your financial

7  returns, tax returns, withholding returns, all of that?

8    A.   Yes.

9    Q.   Did you employ any outside accountants?

10   A.   Yes.

11   Q.   Who is your main outside accountant?

12   A.   Baker Tilly.

13       MR. FLUHARTY:  Baker Tilly.  Okay.  I'm going to

14  have to look at the tax return in order to complete my

15  inquiry, so I'm going to go to creditors now.  I see Beth

16  Kavitz from the U.S. Trustee's Office on the line.  Ms.

17  Kavitz, do you have any questions you would like to ask?

18       MS. KAVITZ:  I don't have any questions.  Thank

19  you.

20       MR. FLUHARTY:  All right.  And I see an Amanda

21  Davis.

22       MS. DAVIS:  Yes.

23       MR. FLUHARTY:  Do you have questions you would like

24  to ask?

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 21 of 70

21

1          MS. DAVIS:  Yes, I do have -- I have several

2     questions.

3          MR. FLUHARTY:  Go ahead.

4          FEMALE VOICE:  Who does she represent?

5          MR. FLUHARTY:  Who do you represent, Ms. Davis?

6          MS. DAVIS:  I represent Wanda Perdue, the Estate of

7     Charles Perry.

8          MR. FLUHARTY:  Okay.  Go ahead.

9                         **EXAMINATION**

10    BY MS. DAVIS:

11    Q.   In light of the fact that PrimeCare of West

12    Virginia claims to have no assets to liquidate and distribute

13    to creditors, what purpose do you hope to achieve in filing

14    the Chapter 7 petition?

15    A.   To be in a position, since it has no operations, no

16    employees, and no intent to ever regain operations, to be in

17    a position to dissolve the corporation, which cannot be done

18    until outside -- we get satisfaction of outside claims.

19    Q.   Are you aware that PrimeCare, because it is a

20    corporation, is not eligible to receive discharge of its

21    debts from Chapter 7 bankruptcy?

22    A.   I am not that savvy as to bankruptcy laws.

23    Q.   Are you aware that anyone with a lawsuit against

24    PrimeCare of West Virginia, as of the date of filing of the

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 22 of 70

22

1  petition, will be able to resume that prosecution of the

2  lawsuit once the Chapter 7 bankruptcy is over unless that

3  person accepts a settlement and agreed to a release or

4  dismissal of the lawsuit in exchange for a settlement?

5      A.   I would defer to the advice of my counsel as to

6  what will occur once the process is concluded.

7      Q.   Are you aware that the trustee has no power to

8  force the creditors to agree to a settlement or release of

9  any of the creditors' claims?

10     A.   I would assume that the trustee lacks that

11  authority, but that's just an assumption.

12     Q.   Are you aware that a Chapter 7 bankruptcy does not

13  legally dissolve a company under either West Virginia or

14  federal law?

15     A.   It's my understanding it doesn't dissolve it, but

16  it may be a necessary step to get to that point.

17     Q.   Are you aware that the West Virginia Code provides

18  a set of procedures for the dissolution of a corporation at

19  the West Virginia Code -- and that that's located in West

20  Virginia Code Section 31D-14-1401?

21     A.   I did not know the cite.  I know states establish

22  rules necessary to follow the dissolving of a company.

23     Q.   Are you aware that the West Virginia Code provides

24  a set of procedures for notifying the public and potential

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 23 of 70

23

1  creditors and claimants, known and unknown, of the

2  dissolution of a company?

3      A.   Again, I would assume there is such a provision,

4  but I was not aware of the specific cite.

5      Q.   Are you aware that the West Virginia Code provides

6  that even dissolution of a company does not terminate, abate,

7  or suspend any lawsuits that have been filed as of the date

8  of the dissolution?

9      A.   I was not aware.

10     Q.   Are you aware that the West Virginia Code provides

11 that even dissolution of a company does not prevent anyone

12 from commencing a lawsuit against that company for purpose of

13 establishing liability to recover against an insurer or an

14 alter ego?

15     A.   Again, I'm not familiar with that specific

16 provision.

17     Q.   Does PrimeCare of West Virginia have regular board

18 meetings and keep minutes of those meetings?

19     A.   Yes.

20     Q.   Can you provide copies of those minutes to the

21 trustee?

22     A.   I assume if the trustee has a request for them and

23 I'm obligated to turn them over, then yes, we would turn

24 those over.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 24 of 70

24

1    Q.   In Form 206A-B of your petition, you list PrimeCare

2   Medical of West Virginia as having no assets of any kind.   Is

3   that correct?

4    A.   Yes.

5    Q.   Now, you talked about having accounts.   Have you

6   closed those accounts?

7    A.   I don't believe they have been technically closed.

8   They just have zero balances.

9    Q.   In addition to those banking accounts, were those

10   checking, savings, or another type of account?

11    A.   They were checking.

12    Q.   When was the last time PrimeCare of West Virginia

13   had a bank account that had money in it?

14    A.   Periodically PrimeCare, as identified with the two

15   settlements that were made, as well as payments to the law

16   firms, PrimeCare, the parent, would infuse capital into the

17   subsidiary periodically to make those payments.   I believe

18   the last time there was probably money in any of those

19   accounts was December of last year.

20    Q.   Do you have records of the activities on those two

21   accounts that you told the trustee about?

22    A.   Yes.

23    Q.   Can you provide those to the trustee?

24    A.   Yes, if there's a request, then --

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 25 of 70

25

1      Q.   Has PrimeCare -- I'm sorry.

2      A.   That's okay.

3      Q.   Has PrimeCare of West Virginia had any other bank

4  accounts that had any money in them at any point in the last

5  two years?

6      A.   No.

7      Q.   Do you have records of the activity of the bank

8  accounts we just talked about over the last five years?

9      A.   I don't know -- Yes, I assume they're available

10  going back that far.

11      Q.   PrimeCare of West Virginia used to receive payments

12  from one or more West Virginia State agencies.  Is that

13  correct?

14      A.   Correct.

15      Q.   What agency was that?

16      A.   It had, for the majority of our time operating in

17  West Virginia, we would have received payments from the

18  Regional Jail Authority, as well as the Division of Juvenile

19  Services, and then near the end of our tenure the payments

20  would have come from the Department of Corrections and

21  Rehabilitation.

22      Q.   And did those payments go -- were those made

23  payable to PrimeCare of West Virginia, or were those made

24  payable to the parent company?

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 26 of 70

26

1      A.   They were made payable to PrimeCare Medical of West

2  Virginia.

3      Q.   Okay.  And was the contract with those agencies,

4  was that contract with PrimeCare of West Virginia, or was

5  that with the parent company?

6      A.   It was with PrimeCare Medical of West Virginia.

7      Q.   When did PrimeCare of West Virginia receive its

8  last payment from a West Virginia agency?

9      A.   I would have to confirm the last -- the exact date,

10  but our operations ceased in June of 2025. [sic]  I believe

11  we --

12          FEMALE VOICE:  No, not 2025.  It can't be.

13          THE WITNESS:  -- had received all payments by

14  October of 2022.

15      BY MS. DAVIS:

16      Q.   What assets did PrimeCare of West Virginia have

17  that were its own assets, not owned by the parent company?

18      A.   There would have been various supplies in the

19  Medical Departments of each institution at which we operated.

20  And, to a limited extent, there may have been used medical

21  equipment as well; blood pressure cuffs, EKGs, vital machine

22  recorders, things of that nature.

23      Q.   What happened -- What did you do with those assets?

24      A.   Most of it remained pursuant to the contract with

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 27 of 70

27

1   DCR and would be reverted to property of the State.  The rest

2   of it, depending upon it, most of it was just scrapped as

3   obsolete.

4       Q.   So when you say under the contract it would have

5   reverted to the State of West Virginia, did they pay you for

6   those assets?

7       A.   No.  It was just part of the contract terms in

8   terms of, you know, you would wire what you need while you're

9   here.  It helps with the transition to the new provider that

10  they don't walk into an empty jail.  So there are times that

11  some things, and I'd have to go back and check, some things

12  may have been sold to Wexford.  And in that case, Wexford

13  would have made a payment to us.

14      Q.   Okay.  And would they have made that payment to

15  PrimeCare of West Virginia, or would they have made that

16  payment to PrimeCare, the parent company?

17      A.   They would have made it to PrimeCare Medical of

18  West Virginia.

19      Q.   Okay.  And when would that payment have been made?

20      A.   That would have been made either before June 22nd

21  of -- or excuse me -- June 25th of 2022 or shortly

22  thereafter.

23      Q.   When you closed down or you ended that contract in

24  June, what happened to your employees?

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 28 of 70

28

1      A.   Many of them were retained by Wexford.   Others

2   elected to get out of the health care field.   When we

3   received notification that we were not going to be the

4   successful bidder, we had to -- we put out a notice to all of

5   our employees that if they stayed through the transition

6   date, they would receive a bonus payment as well as payment

7   for unused leave.   We didn't want to be in a situation where,

8   since we were essentially a lame duck operator down there,

9   that we'd have a lot of medical facilities that would not be

10   adequately staffed, so we provided incentives.   We allowed

11   them to interview with Wexford.   We allowed them to, you

12   know, look for other jobs.

13      Q.   Okay.   Now, with regard to those supplies, did the

14   State of West Virginia -- did you order the supplies?   Did

15   PrimeCare of West Virginia order its own supplies or did it

16   submit an order to the Regional Jail and the Regional Jail

17   provided those supplies?

18      A.   We provide -- PrimeCare Medical of West Virginia

19   would have been responsible for providing all the day-to-day

20   supplies necessary for the Medical Department.

21      Q.   Okay.   And PrimeCare of West Virginia did not have

22   an office in West Virginia.   Is that correct?

23      A.   Not at the time of closing, no.

24      Q.   PrimeCare of West Virginia, all of its officers

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 29 of 70

29

1  were also officers of the parent company.  Correct?

2       A.   There were vice presidents of PrimeCare Medical of

3  West Virginia that were not vice presidents of PrimeCare

4  Medical, but the three that I listed under the previous

5  questioning from the trustee were the same individuals, yes.

6       Q.   Were there any of the people that you're mentioning

7  here with West Virginia -- PrimeCare of West Virginia that

8  lost their jobs as a result of this termination of the

9  contract with the State of West Virginia?

10      A.   They lost their job with PrimeCare Medical of West

11  Virginia, yes.

12      Q.   Okay.  But are they still working for PrimeCare,

13  the parent company?

14      A.   There are only three individuals of the previous

15  400 that transitioned over.

16      Q.   Okay.  And those three people already worked out of

17  the PrimeCare parent company offices in Pennsylvania.

18  Correct?

19      A.   No.  They worked and continue to work out of West

20  Virginia.  Their employer now is PrimeCare Medical.

21      Q.   Okay.  And were they receiving any payments for

22  employment from PrimeCare Medical, the parent company, prior

23  to PrimeCare of West Virginia going out of business?

24      A.   No.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 30 of 70

30

1    Q.   Okay.  Now, which bank account did the payments

2    from the West Virginia agencies go into?

3    A.   The PNC account.

4    Q.   And that's true for the last five years?

5    A.   Yes.

6    Q.   Has PrimeCare of West Virginia ever received

7    payments from anyone other than the West Virginia agency,

8    PrimeCare of West Virginia?

9    A.   I would -- since we were in business for 27 years,

10   I would assume we received payments in some sort or another

11   whether it be a refund from a pharmacy or the like that

12   happened over those years, but not a significant stream of

13   income certainly.

14   Q.   Other than the agencies for the State of West

15   Virginia, you did not provide services for any other

16   companies in West Virginia?

17   A.   I'm hesitating because at times we would be called

18   upon to do like preemployment physicals for law enforcement

19   agencies, but we didn't receive any payment for those, so no,

20   it would have all been through the State agencies.

21   Q.   Okay.  Where did PrimeCare -- so all the deposits,

22   were those in the form of checks that came from the State of

23   West Virginia?

24   A.   Again I'm hesitating because I can't remember at

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 31 of 70

31

1   the end if they converted over to an ACH or if they still --

2   I believe they were always paper checks through the last date

3   of operations.

4       Q.   Okay.  And when was the last time PrimeCare of West

5   Virginia received payment from anyone for the services

6   rendered in West Virginia?

7       A.   Like I said earlier, I'd have to check the exact

8   date.  My recollection was it was about three or four months

9   after operations ceased, I believe, in the October time frame

10  of 2022.

11      Q.   Does PrimeCare of West Virginia have any reasonable

12  expectation that it will operate as a business and receive

13  payments for services rendered or other income ever again or

14  at least over the next five years?

15      A.   No.

16      Q.   Has PrimeCare of West Virginia paid any dividends

17  to shareholders, owners, or members including, but not

18  limited to, PrimeCare's parent company, PrimeCare Medical, in

19  the last five years?

20      A.   No.

21      Q.   Has PrimeCare of West Virginia made any other

22  payments or distributions of any kind, however labeled,

23  including, but not limited to, loan repayments, so not just

24  dividend payments, to shareholders, owners, or members in the

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 32 of 70

32

1   last five years?

2       A.   No.

3       Q.   Does PrimeCare of West Virginia currently have

4   liability insurance to cover claims involving alleged

5   personal injuries due to medical negligence or professional

6   liability?

7       A.   Yes.

8       Q.   Do you have those policy documents?

9       A.   Yes.

10      Q.   Have those been provided to the trustee?

11      A.   I don't believe they've been provided to the

12  trustee.  They've been provided to my counsel who I

13  understand is making them available to certain entities and

14  individuals in West Virginia, the exact identity of which I

15  don't know.

16      Q    Have you notified the State agencies that you had

17  contracts with that you have filed bankruptcy?

18      A.   Not formally.

19      Q.   Excuse me?

20      A.   Not formally.

21      Q.   Okay.  What is the nature of the policy or policies

22  that you currently have in effect?  Is it a claims made or

23  claims occurred?

24      A.   Claims made.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 33 of 70

33

1    Q.   Do those policies have a term referred to as a

2    deductible or a self-insured retention?

3    A.   They don't.  The most recent I know is deductible.

4    They all have either/or an SIR or a deductible.  They change

5    over policy years.

6    Q.   Can you tell me why they changed over the policy

7    years?

8    A.   That was the underwriters' preference for the

9    companies issuing the policies that we purchased.  We didn't

10   have a say in it.

11   Q.   Did you provide copies of those policies to the

12   State agency that employed you?

13   A.   At the time we were operating, yes.

14   Q.   Did you -- and who at the State did you provide

15   those to?

16   A.   There were various individuals had different

17   responsibilities both through the RJA, Divisional of Juvenile

18   Services, and then DCR.

19   Q.   And were those provided annually with every change

20   in policy?

21   A.   They were -- Yes, they would be required to have on

22   hand a current proof of insurance, so, and those policies run

23   from March 16th of one year to March 16th of the next, so

24   every March new information would have been provided.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 34 of 70

34

1       Q.    Now, did you -- Does PrimeCare of West Virginia

2    take the position that under those policies, the insurer will

3    not cover the cost of defense, in other words, pay for an

4    attorney to defend PrimeCare of West Virginia in a claim or

5    lawsuit against PrimeCare of West Virginia unless or until

6    PrimeCare of West Virginia pays the amount owed under the

7    deductible?

8       A.    That has been the standard operating procedure,

9    yes.

10      Q.    Does PrimeCare of West Virginia take the position

11   that under those policies, the insurer will not cover -- I'm

12   sorry.  It looks like I'm asking the same one here.  Does

13   PrimeCare of West Virginia take the position that those

14   policies do not obligate the insurer to make payments to

15   individuals who obtain jury verdicts against PrimeCare of

16   West Virginia unless or until PrimeCare of West Virginia has

17   paid the full amount of the deductible between the payments

18   made by PrimeCare for cost of defense and other claims

19   related to expenses and payments made by PrimeCare of West

20   Virginia to the claimant?

21      A.    I'm sorry.  That was a lengthy question, but I

22   believe in essence you're asking if we take the position as

23   to what the insurer's ultimate obligation is going to be.

24   And if that is the case, my answer would be no, we don't take

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024    Page 35 of 70

35

1   a position either way or not.  It's contractually then for

2   them to take a position as to what their obligation would be.

3       Q.   Are PrimeCare of West Virginia's former employees,

4   including doctors, nurses, and physician's assistants,

5   covered under the policies for medical negligence or

6   professional liability in the scope of their employment, as

7   well?

8       A.   I'm not an insurance expert.  They are not

9   individually named.  I mean, their conduct was subsumed under

10  our defense.

11      Q.   Does PrimeCare of West Virginia have any other

12  policies that would provide coverage for its former employees

13  for medical negligence or professional liability in the scope

14  of their employment besides the policies you've already

15  mentioned?

16      A.   No.

17      Q.   Does PrimeCare of West Virginia take the position

18  with respect to its obligation to make payments up to the

19  deductible for the cost of defense, expenses and to the

20  claimants before the insurer is obligated to cover cost of

21  defense, expenses, and payments to the claimants on behalf of

22  PrimeCare West Virginia's former employees?

23      A.   I hate to do this to you, but could you repeat

24  that?  I'm sorry.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 36 of 70

36

1      Q.   Is it your position that with respect to your

2  obligation to make payments of the amount of the deductible

3  and for the attorney fees, the expenses, and any settlements

4  before the -- that you have to pay those before the insurer's

5  obligation to cover cost of defense, expenses, and payments

6  to claims -- you have to meet your deductible amount before

7  those will kick in?

8           MR. SUPPLE:  I'm going to object to that question.

9  It sounds like the question you just asked a few minutes ago.

10 There's a lot of law on this topic, and bankruptcy law, so

11 that's just a legal question that we're going to have to

12 figure out.  We don't take a position on that.

13          MR. FLUHARTY:  I can't rule -- I can't rule on --

14          MS. DAVIS:  Will you be providing us with copies of

15 the insurance policies so that we can get an expert to look

16 at those policies?

17          THE WITNESS:  I'm sorry.  Was that a question posed

18 to me?  I didn't hear the beginning.

19          MS. DAVIS:  I'm asking your lawyer.

20          THE WITNESS:  Okay.

21          MS. DAVIS:  If that's something he's going to do,

22 is turn those over so that we can get an expert to look at

23 those.

24          MR. SUPPLE:  We've -- yes, we'll cooperate with you

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 37 of 70

37

1    on providing the insurance policies.

2         MS. DAVIS:  Okay.

3         MR. FLUHARTY:  Why don't you provide those to me,

4    and then anyone who asks for them that is entitled to receive

5    them, I'll provide them.

6         MR. SUPPLE:  Okay.

7         BY MS. DAVIS:

8         Q.   Does PrimeCare of West Virginia take the position

9    that it has at all times, including for all non-priority

10   unsecured claims listed on Form 206E/F or Schedule E/F of the

11   petition, maintained medical professional liability insurance

12   in the aggregate amount of at least one million for each

13   occurrence as defined by the West Virginia Code?

14        A.   Yes, with an aggregate of three million.

15        Q.   Has PrimeCare of West Virginia taken any steps to

16   comply with the self-funding program minimum standards of the

17   West Virginia Code?

18        A.   No, we've never been advised of an obligation to do

19   so.

20        Q.   I'm sorry?  You said you were advised you don't

21   need to do so?

22        A.   No, the opposite of that.  We were never advised of

23   an obligation to do so.

24        Q.   Okay.  Has PrimeCare of West Virginia established a

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 38 of 70

38

1   trust and hired a qualified trustee to administer its self-

2   funding program?

3       A.   No, I don't know that we have a self-funding

4   program.

5       Q.   Has PrimeCare of West Virginia hired a qualified

6   third-party claims manager experienced in handling medical

7   professional liability claims with the power and authority to

8   set reserves and administer and oversee the defense of all

9   claims?

10      A.   As part of the insurance contract, we are obligated

11  to work with a group of attorneys selected by the insurer to

12  meet with and provide information regarding outside

13  (phonetic) claims including the setting of ultimately by them

14  reserves.

15      Q.   And do you -- Who were those attorneys?

16      A.   Myra Brown is the chief.  She just switched firms.

17  She's out of Chicago.  I cannot give you the contact

18  information at this time.

19      Q.   Share that with your lawyer, and he can share it

20  with the trustee.  How much money, if any, does PrimeCare

21  currently have in a trust account for the purposes of

22  satisfying the West Virginia MPLA self-funding program

23  requirements of the West Virginia Code?

24      A.   None.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 39 of 70

39

1   Q.   So you have indicated that PrimeCare of West

2   Virginia has not made any money since June of 2022.  Is that

3   correct?

4   A.   We haven't received any money since approximately

5   October 2022.

6   Q.   Okay.

7   A.   The last earned would have been, I guess, June

8   25th.

9   Q.   Okay.  Since that time, since October of 2022, has

10   PrimeCare of West Virginia nonetheless made any payment on

11   its own behalf or on behalf of an employee, former employee

12   of PrimeCare of West Virginia relating to a professional

13   liability or medical negligence claim brought against

14   PrimeCare of West Virginia or an employee such as attorney

15   fees for the defense cost or to a claimant to settle a claim

16   or satisfy a jury verdict?

17   A.   There were no jury verdicts, but yes, it has made

18   payments in those other occurrences.

19   Q.   How many?

20   A.   I don't know off the top of my head sitting here

21   today.  It's information that would be available.  The

22   payments for defense counsel would have occurred monthly

23   since then.

24   Q.   Okay.

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15    2024    Page 40 of 70

40

1          MR. SUPPLE:  There's a list attached to the

2    schedules of those payments.

3          MS. DAVIS:  Okay.

4      BY MS. DAVIS:

5      Q.   In that same time frame since PrimeCare last had

6    money or income, has anyone other than PrimeCare made the

7    payments on behalf of PrimeCare of West Virginia or its

8    employees, the employees of PrimeCare of West Virginia,

9    relating to claims brought against PrimeCare of West

10   Virginia?

11     A.   No.

12     Q.   Did PrimeCare, the parent company, pay any of the

13   settlements or attorney fees related to defending claims in

14   West Virginia?

15     A.   It provided funds to PrimeCare Medical of West

16   Virginia to make those payments.

17     Q.   Okay.  So did you have a loan agreement with

18   PrimeCare, Inc., the parent company?

19     A.   No.  We just kept track of the amount that was

20   being transferred to a subsidiary.

21     Q.   Okay.  And so will that be treated as a business

22   loss by PrimeCare, the parent company, for tax purposes?

23     A.   I don't know how Baker Tilly qualifies that.

24     Q.   Other than the payments made by PrimeCare Medical,

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 41 of 70

41

1    Inc., has any other entity, insurance company, or shareholder

2    paid any claims on behalf of PrimeCare of West Virginia?

3        A.   No.

4        Q.   In the same time frame, we're talking August 2022,

5    has PrimeCare of West Virginia entered into any settlement

6    agreement with any claimant or plaintiff?

7        A.   Yes.

8        Q.   Okay.  Have you paid those claims, those

9    settlements?

10       A.   Yes.

11       Q.   What about the settlement agreement between

12   PrimeCare of West Virginia and Wanda Perdue regarding the

13   death of her son, Charles Perry?  The agreement was signed at

14   mediation in November of 2023.  Is that correct?

15       A.   I don't recall the exact date.

16       Q.   But it was signed after August of 2022.  Correct?

17       A.   Yes.

18       Q.   Were you aware of that settlement?

19       A.   Yes.

20       Q.   And that settlement has been pulled into this

21   bankruptcy.  Is that correct?

22       A.   Yes.

23       Q.   You have not paid that settlement?

24       A.   That is correct.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 42 of 70

42

1    Q.   And that was a settlement of a professional

2  liability claim against PrimeCare of West Virginia arising

3  out of medical negligence by PrimeCare of West Virginia and

4  its employees.   Correct?

5    A.   Those were the assertions, yes.

6    Q.   Okay.   You testified that since August of 2022

7  PrimeCare of West Virginia has had no money or income, and

8  they've had no reasonable expectation for money or income in

9  the future.   Is that correct?

10    A.   Yes.   And I think I said October of 2022, but --

11    Q.   Okay.   You testified earlier that the insurance

12  policies that covered claims for medical negligence such as

13  Wanda Perdue's for her son, Charles Perry, have a deductible

14  and that the insurer has no obligation to make payments for

15  the cost of defense or the settlement until PrimeCare of West

16  Virginia has made payments on its own behalf in the amount

17  equal to the deductible.   Is that correct?

18        MR. SUPPLE:   I object.   We've already talked about

19  this.   It's a complicated issue in bankruptcy, whether the

20  deductible has to be paid, if it's a self-insured retention,

21  you know, how that affects the insurance company's duty, so

22  those are all legal questions we've got to figure out.

23        BY MS. DAVIS:

24    Q.   Given the facts of your prior testimony that as of

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15    2024    Page 43 of 70

43

1    October of 2022 PrimeCare of West Virginia had no money or

2    income, no expectation of money or income in the future, and

3    an insurance policy that did not obligate the insurer to make

4    payments until PrimeCare paid its portion, its deductible,

5    how could PrimeCare of West Virginia promise to pay hundreds

6    of thousands of dollars to the Estate of Charles Perry?

7        A.    There was an expectation that it would receive

8    another capital infusion from the parent.

9        Q.    Is the parent company refusing to make that

10   infusion?

11       A.    Yes.

12       Q.    Is there a reason why they are not willing to make

13   that infusion for the Charles Perry case when they made it

14   for other cases?

15       A.    I was advised we didn't receive the release in the

16   Perry case until, I believe -- well, counsel received it

17   December 18th.  We didn't receive it until the eve of

18   bankruptcy and were concerned about the potential for the

19   appearance of a preferential payment.

20       Q.    Did you expect when that agreement was entered in

21   November of 2023 that the parent company would be making that

22   payment?

23       A.    Yes.  Well, it would be funding that payment.  It

24   would not have been making it.  It would have come from

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 44 of 70

44

1   PrimeCare Medical of West Virginia.

2       Q.   Okay.  How would it -- it would have been issuing a

3   check?  PrimeCare of West Virginia would have been issuing a

4   check.  Correct?

5       A.   Yes.

6       Q.   There's no money currently in the checking account.

7   Correct?

8       A.   Correct.

9       Q.   For PrimeCare of West Virginia.

10      A.   Correct.

11      Q.   So the parent company would have deposited money

12   into PrimeCare of West Virginia's checking account for the

13   sole purpose of PrimeCare of West Virginia turning around and

14   writing a check to Wanda Perdue?

15      A.   Yes.

16      Q.   Okay.  Are you aware of any instances where the

17   settlement check came directly from PrimeCare, the parent

18   company?

19      A.   Not offhand.  If there had been a mistake, I don't

20   know.  I'm not -- I'd have to go back and look.  I don't sign

21   every check that comes out.

22      Q.   Now, did PrimeCare of West Virginia have a contract

23   with the State of West Virginia or other State agencies

24   covering its provisions for medical services in West Virginia

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024    Page 45 of 70

45

1  correction facilities?

2      A.    Yes.

3      Q.    Were those contracts -- was there a new contract

4  every year, or was the contract period for multiple years?

5      A.    When they were awarded, they would be for multiple

6  years, and then West Virginia would issue what was

7  essentially a change order every year renewing the contract

8  at either the same or an adjusted rate for the next year.

9      Q.    Did you negotiate with them every year on that

10  adjusted rate?

11      A.    No.  That would have been done on the front end.

12      Q.    When you say "on the front end," what does that

13  mean?

14      A.    It gets blurry in West Virginia because the

15  consolidation efforts threw everything off or out of whack,

16  but the -- they were typically for -- it was acknowledged

17  when you'd submit an RFP that it was going to be for a three

18  or a five year period.  Part of the RFP would be for -- the

19  proposal would be to describe what mechanism you're using for

20  your increases moving forward, whether a flat percent like 3

21  percent or perhaps an identified CPI, and then if it was

22  flat, it was easy.  We'd just calculate what the next year

23  would be.  The Division of Juvenile Services was slightly

24  different because those contracts were based upon employee

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 46 of 70

46

1  hours provided each facility, so contracting and payment on

2  those were different where we'd have to provide payroll

3  records and then a calculation as to what the ultimate

4  payment would be made -- would be made after the fact.

5      Q.   So what was the most recent contract period with

6  the West Virginia Division of Corrections?

7      A.   We never had a contract with the Division of

8  Corrections.  We had the one with the Division of Juvenile

9  Services.  Then we had with the Regional Jail Authority, and

10  they were to, to the best of my recollection, expire as of

11  2019, but they were, based upon West Virginia's request or

12  mandating, they were just continued as the bidding process

13  went for consolidation.  We had a period in there those two

14  were consolidated into the Department of Corrections and

15  Rehabilitation.

16      Q.   So your last contract with the Regional Jail ended

17  in 2019, and so then you were just on a year-to-year basis

18  while the bidding was ongoing?

19      A.   Yeah.  It got very -- because they had anticipated

20  that the proposal process was going to be much more quick

21  than they anticipated.  They had an initial go around where

22  they ended up throwing out all of the proposals because they

23  perceived them to be too expensive.  So they went back out

24  and did it a second time, and during that period they had

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 47 of 70

47

1    essentially said, "You're going to be held to the last

2    contract year until there is a change," and then when that

3    change dragged out not six months, but over multiple years,

4    there was an adjustment in the price at one point, but that

5    was just negotiated in order to continue.  They were sort of

6    like -- we almost went into a month-to-month, year-to-year

7    process while they were trying to work this out.

8        Q.   Do you have something in writing to support that,

9    to evidence as what was going on during that time frame and

10   what the expectations were for PrimeCare Medical?

11       A.   Yeah, there would have ultimately been one of those

12   like change orders that I referenced executed which showed

13   the new rate going forward.

14       Q.   So the change orders reflect the new contract --

15   basically what is a temporary contract after 2019?

16       A.   Essentially, yes.

17       Q.   Okay.  And do those contracts require PrimeCare of

18   West Virginia to maintain medical professional liability

19   insurance coverage up to any certain amount?

20       A.   Yes.

21       Q.   Do you recall what that amount was?

22       A.   One million per occurrence, three million

23   aggregate.

24       Q.   Okay.  Does the contract or those contracts require

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 48 of 70

48

1    PrimeCare of West Virginia to maintain medical professional

2    liability insurance coverage for any certain period of time

3    following the expiration of the contract, kind of like tail

4    coverage?

5         A.   I don't believe so, no.

6         Q.   Does PrimeCare of West Virginia take the position

7    that it has at all times, including all the non-priority

8    unsecured claims listed on Form 26F -- I'm sorry -- E/F or

9    Schedule E/F of the petition, maintained insurance that

10   satisfies its contractual obligation with the State of West

11   Virginia?

12        A.   Yes, that was our understanding.

13        Q.   Does PrimeCare of West Virginia have a contract or

14   has it ever had a contract with anyone else such as PrimeCare

15   Medical, the parent company, or any other PrimeCare Medical

16   affiliate or subsidiary company to obtain insurance on

17   PrimeCare of West Virginia's behalf or for the benefit of

18   PrimeCare of West Virginia or its employees?

19        A.   There is no contract in place, no.

20        Q.   Were there any insurance contracts that the parent

21   company has, PrimeCare Medical has that provides insurance

22   coverage for PrimeCare of West Virginia or PrimeCare of West

23   Virginia's employees?

24        A.   I'm sorry, I --

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15    2024    Page 49 of 70

49

1      Q.    Does the parent company have any insurance policies

2   that cover PrimeCare of West Virginia and its employees?

3      A.    The policy identifies PrimeCare Medical as the

4   named insured, and then there is an endorsement that lists

5   PrimeCare Medical of West Virginia as an additional named

6   insured.

7      Q.    So the insurance policies during the contracts that

8   you had with the State of West Virginia, those were all

9   purchased by PrimeCare Medical, the parent company?  Is that

10  correct?

11     A.    They were purchased by PrimeCare Medical of West

12  Virginia; PrimeCare, Inc., the parent; and PrimeCare Medical

13  of New York.

14     Q.    Okay.  So how did payment for that work as far as

15  who paid for that -- for that -- paid those bills for that

16  insurance?

17     A.    There would be an allocation of that portion of the

18  obligation on the PrimeCare Medical of West Virginia

19  financials, and then the payment would be made by PrimeCare

20  Medical, Inc.

21     Q.    Okay.  So basically you said PrimeCare Medical,

22  Inc., the parent company; PrimeCare Medical New York; and

23  PrimeCare Medical of West Virginia.  There was one policy.

24  Correct?

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 50 of 70

50

1      A.    Yes.

2      Q.    And the three entities divided the bill up between

3  the three?  Is that correct?

4      A.    Yes.  It was allocated among the three and then

5  paid by the parent.

6      Q.    Okay.  And do you have documents that show that

7  allocation?

8      A.    It would be broken down not only to PrimeCare

9  Medical of West Virginia, but individual sites in which we

10  operated showing their corresponding legal and insurance

11  expenses.

12      Q.    But there are documents that you can provide to the

13  trustee to show that.  Correct?

14      A.    Yes.

15      MS. DAVIS:  I think that's all the questions that I

16  have.  Yes, that's all my questions.  Thank you for your

17  time.

18      MR. FLUHARTY:  Ms. Davis, there were a number of

19  items I think you wanted.  You wanted board minutes from what

20  time period?

21      (No response heard from Ms. Davis.)

22      MR. FLUHARTY:  Amanda Davis?  I think I lost her.

23  Okay.  All right.  All right.  Stephen New, do you have

24  questions?

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 51 of 70

51

1          MALE VOICE:  You're muted.

2          MR. FLUHARTY:  I'm sorry.  Is Amanda Davis still

3    there?

4          MS. DAVIS:  I'm still here.

5          MR. FLUHARTY:  Okay.  There were some items that

6    you requested.  Maybe you should just maybe -- maybe just

7    give me a call or send me an email and tell me what they are,

8    and then I'll pass them along to Joe and to -- or Mr. Supple,

9    and we can get those to you as quickly as possible.

10         MS. DAVIS:  Thank you.

11         MR. FLUHARTY:  All right.  I had the board minutes,

12   some liability policies, and some other information, but if

13   you can send me a list.

14         MS. DAVIS:  I'll email a list and copy Mr. Supple

15   on that.

16         MR. FLUHARTY:  Okay.  That is fine.  Stephen New,

17   do you have questions you'd like to ask Mr. Weber?

18         MR. NEW:  I do, Your Honor.

19                         **EXAMINATION**

20      BY MR. NEW:

21      Q.   Good morning, Mr. Weber.  This is Stephen New.  I

22   represent the putative class in the Rose matter as well as

23   Rebecca Chapman in a stand-alone case and a number of other

24   individuals.  I'm going to try to not be repetitive of either

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 52 of 70

52

1    the trustee's questions --

2           FEMALE VOICE:  Rebecca Chapman and who else?

3    BY MR. NEW:

4    Q.   -- or Ms. Davis's, so if I jump around a little

5    bit, I apologize.  Let's begin first with the RFPs, and

6    that's what's commonly referred to as the contract between

7    PrimeCare West Virginia, Inc., and the State of West

8    Virginia.  Correct?  You're familiar with the term RFP?

9    A.   Yes.  The RFP is actually the request for proposal,

10   to submit a proposal in response to trying to enter into a

11   contract either with the Department of Corrections on the

12   State level or, as I said, most of our business was done

13   between the Division of Juvenile Services and the Regional

14   Jail Authority before they were consolidated.

15   Q.   Okay.  Well, let's talk about that.  The contract

16   that PrimeCare West Virginia entered into in response to the

17   RFP was approximately July 2016.  Correct?

18   A.   Yes.

19   Q.   And that was with the Regional Jail Authority at

20   that time.  Correct?

21   A.   Yes.

22   Q.   Now, when you mention consolidation of the Division

23   of Corrections and Rehabilitation which consolidated West

24   Virginia's prisons, jails, and juvenile facilities, that

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 53 of 70

53

1   occurred July 1 of 2018.  Correct?

2       A.   I assume that's the correct date.  I don't remember

3   when --

4       Q.   Okay.  I'll represent to you, based upon my

5   representation of approximately 8,000 inmates in the Rose

6   matter, that consolidation occurred July 1st, 2018.  And

7   subsequent to that, PrimeCare West Virginia kept the contract

8   with West Virginia's regional jails and some juvenile

9   facilities.  Correct?

10      A.   We continued to provide the care, yes.  I think the

11  contract transferred to DCR at that time, but --

12      Q.   All right.  Now, there was a new RFP sent out by

13  the State May 17, 2021, relative to the provision of health

14  care in West Virginia's prisons, jails, and juvenile

15  facilities.  Correct?

16      A.   Yes.

17      Q.   And did PrimeCare West Virginia bid on that RFP

18  that came out May 17, 2021?

19      A.   Yes.

20      Q.   And PrimeCare West Virginia lost that bid in favor

21  of Wexford.  Correct?

22      A.   Yes.  I believe the technical term is they actually

23  determined our response not to be responsive, threw it out,

24  and only us and Wexford submitted proposals.

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15    2024    Page 54 of 70

54

1      Q.   Okay.  But be that as it may, PrimeCare didn't lose

2  the work -- PrimeCare West Virginia didn't lose the work in

3  West Virginia because of consolidation which occurred July 1

4  of 2018.  PrimeCare West Virginia was not selected for the

5  RFP that came out May 17, 2021.  Isn't that the most accurate

6  statement, Mr. Weber?

7      A.   Yes, and if my earlier testimony clouded that, I

8  apologize.  That was not my intent.  We did not -- we were

9  not the successful bidder at the end.

10     Q.   Okay.  And meaning that it was the 2021 RFP which

11 PrimeCare West Virginia was not successful in gaining that

12 work, but PrimeCare West Virginia wanted that work.  Is that

13 a fair statement?

14     A.   Yes, we submitted a proposal.

15     Q.   Okay.  Now, in one of the questions about -- from

16 the trustee about records in this case, I want to make sure

17 that I ask a followup about this.  You mentioned a data farm

18 in Virginia.  Do you recall that, sir?

19     A.   Yes.  I believe it's in Virginia, but yes.

20     Q.   Okay.  Regardless of location, what types of

21 records does this data farm maintain?

22     A.   Virtually all records of operations for PrimeCare

23 Medical of West Virginia as well as the parent entity and

24 PrimeCare Medical of New York.  So we have 23-, 24-thousand

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15    2024    Page 55 of 70

55

1    patients today.  Their EMR is obviously accessible at the

2    facilities, but there's backups.  I gave you all our

3    financial records.  All of that type of data on the computer

4    is backed up and stored.

5         Q.  All right.  So let's break it down.  Patient

6    medical records, how long in the State of West Virginia are

7    those required to be maintained, sir?

8         A.  I believe it is seven years after the last date of

9    treatment.

10        Q.  All right.  So PrimeCare West Virginia would be

11   required to maintain patient records.  If the last date that

12   you all operated here in West Virginia was June the 25th of

13   2022, you all should have patient medical records going back

14   to June the 25th, 2015.  Is that about right?

15        A.  Well, no.  We should have patient records going

16   back to June -- well, let's take today as an example.  We

17   should have records going back to February 15th of 2017.

18        Q.  Okay.  So your position is it would be from present

19   back seven years, not from the last date that PrimeCare West

20   Virginia treated a West Virginia inmate back seven years.

21   Correct?

22        A.  Well, sort of, yes, and it's a little complicated

23   because it's the date of last treatment.  So we can't just

24   purge all records as of February 15th of 2017.  It would only

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 56 of 70

56

1    be any individuals we have not seen or treated since February

2    15th of 2017.  So if the individual remained incarcerated

3    after that period of time or became reincarcerated, it starts

4    the seven-year period running anew.

5        Q.   But PrimeCare West Virginia has treated no inmate

6    patients since June the 25th of 2022.  Correct?

7        A.   Correct.

8        Q.   And your position is that you could have -- is that

9    PrimeCare West Virginia doesn't have to have seven years'

10   worth of medical records essentially locked into June the

11   25th of 2015?  Do you see what I'm saying?  You all haven't

12   treated any patients since June the 25th of 2022.  Wouldn't

13   that have locked in the seven-year obligation to maintain

14   patient records?

15       A.   Yes, but it's on a rolling basis.  We will not be

16   freed of an obligation to maintain records until June 25th of

17   2029, and those records -- some of those records may go back

18   for a period of time much greater than that.  So if we had --

19   if we have a patient that we saw in 2013, 2015, 2017, 2019,

20   2021, we have all of those records still, even though some of

21   them go back, you know, more than a decade.

22       Q.   Because it goes from date of last treatment?

23       A.   Last treatment, yes.

24       Q.   Yes, sir.  I understand that.  Very well.  Thank

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 57 of 70

57

1  you.  Now, let's talk about other records that the data farm

2  in Virginia might maintain.  Would PrimeCare's emails be

3  maintained at this data farm in Virginia?

4     A.   We have -- we have storage onsite as well as that's

5  where all the backup goes, but yes, they would be the

6  repository of last resort for all of that stuff.

7     Q.   All right.  And how long does PrimeCare West

8  Virginia and the parent maintain emails?

9     A.   Five years.

10     Q.   Your medical records were used in a system called

11  CorEMR.  Correct?

12     A.   Yes.

13     Q.   And at the time of the transition to Wexford, did

14  PrimeCare transfer its CorEMR account to Wexford, or how were

15  the inmate patients' medical records transferred from

16  PrimeCare CorEMR to Wexford, who I understand also uses

17  CorEMR?

18     A.   Yes, but their CorEMR is different than ours.  They

19  can be modified to provide certain treatment procedures that

20  one of us follows that the other may not, so a complete set

21  of the records would have downloaded and provided to Wexford

22  in a read-only format.  Then they were provided with a laptop

23  with a full set of the records in that read-only, and our

24  system and their system worked together for a couple of weeks

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 58 of 70

58

1   during the transition so that the two systems could talk and

2   any essential data could be converted over to Wexford.

3       Q.   And my understanding was that this is a license

4   that a correctional health care company has with the company

5   CorEMR and can basically make various settings for how you as

6   the end user want that to operate.   Correct?

7       A.   Essentially.   CorEMR is -- there's a company that

8   created the electronic medical record known as CorEMR and did

9   the vast majority of the engineering and software writing for

10  that.   With our agreement with Core, we have the ability to

11  go in and actually modify their platform to address some of

12  the things that we want.   I am not aware of whether Wexford

13  has the same capability or not.

14      Q.   Now, in terms of other records, we've talked about

15  medical records.   We've talked about emails.   What other

16  types of records are maintained through the data farm?

17          MR. FLUHARTY:   And, Mr. New, this is Tom Fluharty,

18  and Mr. Weber, there is a debtor waiting at Joe Supple's

19  office, a consumer debtor.   This is going for a while.   Their

20  creditors meeting was scheduled for 10 o'clock.   I'm going to

21  take a break on this case and take up that case.   It will

22  take about three minutes, and then we'll come back to this.

23  Okay?

24          MR. WEBER:   Thank you, Your Honor.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 59 of 70

59

1          MR. FLUHARTY:  Okay.  So, Mr. New, Mr. Weber, Ms.

2    Davis, Ms. Kavitz, if you are listening, if you can sort of

3    pause and just -- I'm going to take up the Lambert case.

4          (Brief recess taken.)

5          MR. FLUHARTY:  All right.  We're all back.  Mr.

6    Supple is there.  Mr. Weber is there.  Mr. New's there.  Mr.

7    New, you can proceed with your questioning.

8          MR. NEW:  Thank you.

9       BY MR. NEW:

10      Q.   Mr. Weber, I'm sorry.  We were talking about

11   records on the data farm when we broke.  And we had talked

12   about emails.  We had talked about medical records.  What

13   other types of records are maintained at the data farm which

14   you believe may be in Virginia?

15      A.   Essentially every record of our business operation.

16   I mean, it's similar to how law firms used to work where, you

17   may remember, Mr. New, where you had a paper file and you

18   would punch the correspondence and put in a folder and keep

19   it in your filing cabinet.  Then when the case is over, you'd

20   hold onto it.  Perhaps you would scan it into a computer or

21   not.  Now, you know, all your stuff that comes in, you get

22   your deposition transcript and you put it in a folder in your

23   Rose case or whatever it is.  Our operations are not

24   dissimilar to that now where bank records, we have daily

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 60 of 70

60

1  reconciliations of funds received, payments made, those are

2  all on a system, and that system is backed up.

3  Correspondence that we get, all of our audited financial

4  statements, our tax returns, all of them find them somewhere

5  in way to a designated electronic file and then are also

6  stored, so.

7      Q.   At the period of time that PrimeCare West Virginia

8  had the contract with the State of West Virginia to provide

9  health care for inmates at regional jails, was there any type

10  of internal messaging program used by or among PrimeCare or

11  its parent's employees, aside from email?

12      A.   Yeah, not -- not -- Email.  I mean, there's like

13  our payroll system converted to Kronos, and there's a

14  scheduling component and messaging that you can do through

15  there like requesting time off.  Some staff rely on text

16  messaging, but most of our facilities prohibit our staff from

17  having cell phones within the walls, so email tends to be the

18  most convenient vehicle, but we did not set up any separate

19  IM messaging or anything like that that was used on a routine

20  basis.

21      Q.   Okay.  With respect to PrimeCare of West Virginia,

22  if Ms. Davis asked this, I apologize, Mr. Weber.  What

23  corporate services were provided by the parent PrimeCare

24  Medical, Inc., for PrimeCare West Virginia, like HR, payroll,

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 61 of 70

61

1  anything like that?

2  A.   The corporate office here in Harrisburg

3  consolidates and then provides the majority of those systems

4  around the whole platform, and there's individuals that are

5  then assigned.  You know, as I said, we had our separate West

6  Virginia VPs.  We would have had our separate West Virginia

7  regional managers who would have been on the ground and

8  touring the places on a periodic basis.  But our HR

9  Department is located here.  Our Finance Department is

10  located here.  Our Recruiting Department is located here, but

11  with the recruiters, you know, we have one or two that are

12  designated per state per facility.  So, and then in preparing

13  our internal financial documentation, those resources are

14  supposed to be accounted for based upon who is providing the

15  work, but all the corporate employees themselves are

16  employees of PrimeCare Medical, the parent.

17  Q.   Meaning, for instance, that -- then let's take HR,

18  for instance.  The HR people are employed by the parent.

19  They provide services for various subsidiaries.  Correct?

20  A.   Correct.

21  Q.   All right.  Thank you.  Let's talk now about the

22  insurance policies, and I'm not asking any opinions.  I've

23  heard Mr. Supple's objections regarding SIRs and deductibles,

24  but I want to go policy by policy now, if I may, to ask who

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 62 of 70

62

1   paid this.  There is a $1.795 million premium on the 2019

2   policy for a 10 million dollar aggregate insurance policy

3   whereby PrimeCare Medical, Inc., was the parent and PrimeCare

4   West Virginia was an additional insured.  Correct?

5         A.   Additional named insured I believed is the term.

6         Q.   Additional named insured.  Who paid the $1.795

7   million in premiums for the 2019 policy year?

8         A.   The premium, the check would have been written out

9   of PrimeCare Medical, the parent.

10         Q.   All right.

11         A.   And then when preparing the financial statements

12   for the various entities and sites, a portion of that expense

13   would be apportioned across the board based upon ADP per site

14   or per facility in a state.

15         Q.   Yes, sir, I --

16         A.   But the payment itself was made by the parent.

17         Q.   I understand that.  And irrespective of whether or

18   not the $250,000 is a deductible or an SIR, do you know

19   whether or not the 250,000 dollar deductible or SIR was

20   exhausted for 2019?

21         A.   I can get that specificity information.  I don't

22   know it for certain.

23         Q.   Okay.  Very well.  Thank you.  With respect --

24         A.   That would have been 250 per claim, so I don't -- I

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 63 of 70

63

1   can't recall back in '19 whether the -- I believe it had been

2   on particular claims, but the aggregate had not been reached.

3        Q.   What was the aggregate amount of SIRs that had to

4   be paid?

5        A.   Again, I can get you that information, Mr. New.  I

6   don't recall.

7        Q.   Okay.

8        A.   It's -- I would assume -- I mean, it typically

9   would have been a $250,000 deductible per claim without an

10  aggregate deductible amount.

11       Q.   Okay.  Same question with respect to the 2020

12  policy.  It indicates that a 2.75 million dollar premium.  Is

13  your answer the same with respect to the parent paying it and

14  then it being reconciled and apportioned to various subs?

15       A.   Yes.

16       Q.   And I take it that if I ask you that same question

17  relative to 2021 and 2022 for the 1.2 million dollar premium

18  and the 1.05 million dollar premium for the 2022 policy, that

19  your answer would be the same, sir?

20       A.   Yes, that's right.

21       Q.   Do defense costs erode the SIR, to your knowledge?

22       A.   Yes.

23       Q.   And so you would likewise be able to provide the

24  trustee with whatever either PrimeCare Medical, Inc., the

1 parent, or PrimeCare West Virginia had paid for defense costs

2 which served to erode the SIR or deductible?

3     A.   On each -- yeah, they could be broken down per

4 claim and then obviously totaled.

5     Q.   Very well.  You had mentioned in response to the

6 trustee's question that PrimeCare West Virginia was

7 essentially self-insured, and I know that Ms. Davis asked you

8 a number of questions about the Medical Professional

9 Liability Act.  Sir, did either yourself or anyone else on

10 behalf of PrimeCare West Virginia ever work with the West

11 Virginia Insurance Commission in order to obtain the ability

12 for PrimeCare West Virginia to operate self-insure relative

13 to medical professional liability claims or civil rights

14 claims?

15     A.   PrimeCare met with a couple of years ago -- we meet

16 on an annual basis with insurance brokers and agents to

17 explore what options are out there.  A couple of years ago an

18 effort was made to explore the possibility of becoming truly

19 self-insured, and the problem that arose with that with the

20 operations in multiple states by the different entities so

21 that the funding source that would have been required for

22 each of the five states in which operations accrued under the

23 umbrella was financially prohibitive.

24     Q.   Meaning that the bonds that you would have to post

Case 6:24-bk-60001    Doc 31-1    Filed 04/08/24    Entered 04/08/24 13:48:03    Desc
Exhibit Transcript of Meeting of Creditors of February 15    2024    Page 65 of 70

65

1   in five different states made it not cost effective to

2   actually operate self-insured in each of those five states.

3   Correct?

4       A.   Yeah, it made it financially impossible.  The

5   resources weren't available to fund those bonds or put up the

6   cash collateral.  There was also the possibility of looking

7   into forming a risk retention group, which on a federal basis

8   is an opportunity to try to avoid some of those funding

9   requirements on a state level, but that also was not a viable

10   option.

11       Q.   And so back to my question relative to the

12   Insurance Commission.  Did either you or anyone on PrimeCare

13   Medical or PrimeCare West Virginia's behalf ever deal with

14   the Office of the West Virginia Insurance Commission about

15   operating PrimeCare West Virginia in a self-insured manner?

16       A.   No one on behalf of PrimeCare Medical of West

17   Virginia or PrimeCare had any of those discussions directly.

18   If any such discussions occurred, they would have been as a

19   result of insurance consultants reaching out, and I don't

20   know if they ever actually reached out to the State or merely

21   had familiarity with what the requirements were and relied on

22   that in doing a feasibility analysis.

23       Q.   I understood your testimony to be, in response to

24   one of Ms. Davis's questions, that PrimeCare Medical, Inc.,

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 66 of 70

66

1     was the primary insured for the insurance policies that were

2     required under the RFP with the State of West Virginia.

3     Correct?

4        A.   The policy -- the policy supplied to West Virginia

5     to approve the requisite insurance would have named PrimeCare

6     Medical as the named insured and it would have had an

7     endorsement identifying PrimeCare Medical of West Virginia as

8     an additional named insured.

9        Q.   And it also -- the RFP required that the State of

10    West Virginia be an additional named insured, as well.

11    Correct?

12       A.   I don't believe they're an additional named

13    insured.  They're an additional insured.  There's a subtle

14    difference in the insurance industry that I don't understand,

15    but it did require an endorsement that identified them

16    holding some rights including notice of not paying their

17    premiums, cancellation of coverage, things like that.

18       Q.   And I believe I understood your testimony to be

19    that with the State of West Virginia, the contract that the

20    medical malpractice and the professional liability coverage

21    was one million per occurrence, three million in the

22    aggregate.  Correct?

23       A.   That's, yes, that's my understanding.

24       Q.   Did either PrimeCare Medical, Inc. and/or PrimeCare

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 67 of 70

67

1   of West Virginia have, from 2020 to 2022, any excess or

2   umbrella insurance policies?

3        A.   No, as to excess insurance policies that would

4   cover malpractice or professional liability.  No, for the

5   same for umbrella policies.  There is an umbrella policy not

6   applicable in place by PrimeCare Medical, Inc.

7        Q.   Sir, with all due respect, regardless of whether

8   you or someone believes those policies are applicable, can

9   you provide those to your counsel?

10       A.   Yeah, I have agreed to do so, yes.  I provided the

11  med mal and the professional liability, and I'm pulling

12  together the general liability as well as the umbrella

13  information.

14       MR. NEW:  All right.  Mr. Weber, I appreciate your

15  time today.  Thank you very much.  Mr. Fluharty, Mr. Supple,

16  thank you.

17       MR. FLUHARTY:  Mr. New, if you'll email me and tell

18  me the documents you'd like to have so I can coordinate that

19  with Mr. Supple, I'd appreciate it.

20       MR. NEW:  Yes.  Your email?

21       MR. FLUHARTY:  It's six initials, T as in Tom, H as

22  in Harry, F as in Frank, A as an apple, another A as in

23  apple, and L as in Larry, those six initials, THFAAL at AOL

24  dot com.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 68 of 70

68

1          MR. NEW:  I'll send you that list.  Thank you very

2     much, Mr. Fluharty.

3          MR. FLUHARTY:  Thanks so much.  Ms. Davis, do you

4     have any other questions?

5          (No response heard from Ms. Davis.)

6          MR. FLUHARTY:  Maybe she's muted.  She is muted.

7          MS. DAVIS:  No, sir, I do not have any other

8     questions.

9          MR. FLUHARTY:  Very well.  Ms. Kavitz, do you have

10    any questions?

11         MS. KAVITZ:  No, sir.  Thank you.

12         MR. FLUHARTY:  Thanks so much.  All right.  So

13    because I need to review the tax return and I may have a few

14    more questions, I am going to not conclude this meeting of

15    creditors.  I am going to continue it to March 7th, 2024, at

16    9 o'clock a.m.  Thanks so much for participating.  Have a

17    good day.

18         (Meeting of Creditors Continued to March 7th, 2024.)

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 69 of 70

69

REPORTER'S CERTIFICATE


STATE OF WEST VIRGINIA,

COUNTY OF PUTNAM, to-wit:


      I, Wendy M. Thomas, Notary Public within and for the State of West Virginia, duly commissioned and qualified, do hereby certify that the foregoing bankruptcy meeting of creditors was duly and correctly transcribed by me or under my direct supervision, and that the said transcript is a true record of the testimony given by said witness.


      I further certify that I am not connected by blood or marriage with any of the parties to this action, am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, or financially interested in the action, or interested, directly or indirectly, in the matter in controversy.

Case 6:24-bk-60001   Doc 31-1   Filed 04/08/24   Entered 04/08/24 13:48:03   Desc
Exhibit Transcript of Meeting of Creditors of February 15   2024   Page 70 of 70

70

I certify that the attached transcript meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code.

Given under my hand this 25th day of March, 2024.

My commission expires March 15, 2025.

Notary Seal:

_____

Wendy M. Thomas
Certified Court Reporter
and Notary Public